**In re WOODS FARMERS COOPERATIVE ELEVATOR CO., Debtor.**

**Bankruptcy No. 89–05299.**

United States Bankruptcy Court,
D. North Dakota.

Oct. 13, 1989.

Wayne Drewes, Fargo, N.D. Trustee.

Kip M. Kaler, Fargo, N.D. for trustee.

Roger J. Minch, Fargo, N.D. for St. Paul Bank for Co-ops.

Rodney and Marie Thompson, West Fargo, N.D., pro se.

Jay D. Carlson, Fargo, N.D. for James E. Nygard.

John C. Irby, Casselton, N.D., Lowell P. Bottrell, and David L. Johnson, Fargo, N.D., for various grain claimants.

Vicki Aldridge, Fargo, N.D., for USA/CCC.

William Binek, Bismarck, N.D., for North Dakota Public Service Com'n.

Dorothy Anderson, Sheldon, N.D., pro se.

Bruce Carlson, Fargo, N.D., for Farmland Mut. Ins. Co.

Rebecca Theim Benson, Bismarck, N.D., for North Dakota Grain Dealers.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the court on issues raised in connection with interests claimed in the proceeds of grain formerly in storage at the Debtor's elevator facility.

The Debtor, Woods Farmers Cooperative Elevator Co. (Elevator), was the owner and operator of a public grain warehouse licensed under the laws of North Dakota and situated at Leonard, North Dakota. It filed for relief under Chapter 7 of the U.S. Bankruptcy Code on April 13, 1989, and on that date Wayne Drewes was appointed trustee. On June 7, 1989, an order was entered pursuant to section 557 of the Bankruptcy Code authorizing the trustee to sell all grain in storage with any liens and claims of ownership attaching to the proceeds. It was further ordered that all sale proceeds be deposited in an interest bearing account. An agent was duly employed for this purpose and all grain was sold. The trustee's report reveals the following grain sold:

| Commodity | Bushels Sold | $ Net/Bushels Price | $ Net to Fund |
|---|---|---|---|
| WINTER WHEAT | | | |
| # 2 | 1,944.03 | 3.8301 | 7,445.64 |
| SPRING WHEAT | | | |
| # 1 | 31,259.27 | 4.131 | 129,123.17 |
| # 2 | 5,675.31 | 4.090 | 23,225.74 |
| | 36,934.58 bu. | | |
| CORN | | | |
| # 1 | 7,159.96 | 2.552 | 18,272.92 |
| # 2 | 35,800.36 | 2.552 | 91,366.33 |
| # 3 | 64,439.64 | 2.520 | 162,379.88 |
| # 4 | 50,134.59 | 2.470 | 123,821.22 |
| # 5 | 60,828.26 | 2.371 | 144,222.41 |
| Sample | 88,006.90 | 2.148 | 189,065.97 |
| Screenings | 16,248.72 | 1.885 | 30,641.07 |
| | 322,618.43 bu. | | |
| SOYBEANS | | | |
| # 1 | 12,798.00 | 6.717 | 85,959.37 |
| # 2 | 17,112.25 | 6.693 | 114,536.49 |
| # 3 | 2,912.30 | 6.662 | 19,403.16 |
| # 4 | 993.65 | 6.460 | 6,419.03 |
| Sample | 979.78 | 6.728 | 6,591.67 |
| | 34,795.98 bu. | | |
| BARLEY | | | |
| # 1 | 111,814.34 | 1.881 | 210,272.64 |
| # 2 | 77,746.40 | 1.857 | 144,372.89 |
| # 3 | 23,894.51 | 1.890 | 45,167.46 |
| Sample | 28,740.06 | 1.707 | 49,050.06 |
| | 242,195.31 bu. | | |

| Commodity | Bushels Sold | $ Net/Bushels Price | $ Net Fund |
|---|---|---|---|
| **OATS** | | | |
| # 4 | 910.00 | 1.239 | 1,127.90 |
| **RYE** | | | |
| # 2 | 553.53 | 1.450 | 802.62 |
| TOTAL | 639,951.86 bu. | | $1,603,459.94 |

Interest has continued to accumulate and as of July 31, 1989, interest totalling $6,541.10 had been earned on the proceeds on deposit.

A scheduling order issued on June 7, 1989, expediting the procedures under section 557(d) resulted in there being filed 53 claims against the grain asset proceeds which in turn spawned a number of objections and issues regarding the nature of the claims themselves and the relative priorities between them. On September 7 and 8, 1989, a hearing was held to resolve general issues central to any proceeds distribution as well as the validity and amount of certain specific claims which also must be resolved before distribution. Claims against the grain proceeds are variously based upon warehouse receipts/scale tickets, contracts for future delivery, present contracts, installment sale contracts, unit train shipments and blanket security interests in the Debtor's personal property and inventory.

Claims based upon receipts and upon which the commodity type, quantity and grade are identified are summarized below:

| Commodity | Bushels |
|---|---|
| **WINTER WHEAT** | |
| # 4 | 5,731.50 |
| (no receipts specifying # 2 winter) | |
| **SPRING WHEAT** | |
| # 1 | 18,370.50 |
| # 2 | 5,977.00 |
| # 3 | 495.00 |
| | 28,062.00 bu. |
| **CORN** | |
| # 1 | 24,405.09 |
| # 2 | 183,072.62 |
| # 3 | 38,692.98 |
| # 4 | 5,129.40 |
| | 251,300.29 bu. |
| (no receipts specifying # 5, sample or screening grades) | |
| **SOYBEANS** | |
| # 1 | 18,825.74 |
| # 2 | 2,984.33 |
| # 3 | 1,205.00 |
| | 23,015.07 bu. |
| (no receipts specifying # 4 or sample grades) | |
| **BARLEY** | |
| # 1 | 5,445.00 |
| # 2 | 141,585.08 |
| # 3 | 67,632.26 |
| # 4 | 19,744.00 |
| | 234,406.34 bu. |

| Commodity | Bushels |
|---|---|
| (no receipts specifying sample grade) | |
| OATS | |
| # 2 | 8,187.00 |
| (no receipts specifying # 4 grade) | |
| RYE | |
| # 4 | 558.00 |
| (no receipts specifying # 2 grade) | |
| TOTAL | 548,040.50 bushels |

In addition to the above, there are in evidence grain receipts upon which either the commodity type or grade are unspecified, to-wit: 500 bushels of # 1 wheat unspecified as to winter or spring (claim # 2); 24,605.58 bushels of corn unspecified as to grade (claims # 56, 51, and 44); 539 bushels of barley unspecified as to grade (claim # 45).

Except for winter wheat and rye, there were sufficient quantities of commodity type sold to cover the receipts for like commodity if no distinction is made between grades. However, when the particular grade of the commodity sold is taken into account there are the following deficiencies:

| | | |
|---|---|---|
| # 4 Winter Wheat | 2,512.00 | bu. |
| # 2 Spring Wheat | 3,521.19 | bu. |
| # 3 Spring Wheat | 495.00 | bu. |
| # 1 Corn | 17,245.13 | bu. |
| # 2 Corn | 147,272.26 | bu. |
| # 1 Soybeans | 6,027.74 | bu. |
| # 2 Barley | 63,838.68 | bu. |
| # 3 Barley | 43,737.75 | bu. |
| # 2 Oats | 81.87 | bu. |
| # 4 Rye | 558.00 | bu. |

1.

THE CLAIM OF ST. PAUL BANK FOR COOPERATIVES. The St. Paul Bank for Cooperatives (Bank) does not premise its claim upon receipts of any kind and makes no claim to the proceeds which can be traced to a receipt for a specific grade, quantity and type of commodity. Its claim rests upon a series of three security agreements each of which granted it a security interest in all the Debtor's personal property and fixtures including (among other things) inventory and general intangibles.

Recognizing that it is not the intrinsic nature of the goods which classifies them but the manner in which they are used, grain once sold to an elevator may constitute inventory. N.D.Cent.Code § 41–09–09(4) (U.C.C. § 9–109(4)). *First Bank v. Pillsbury Co.*, 801 F.2d 1036 (8th Cir.1986). Upon this principal the bank claims a perfected security interest in any grain owned by the elevator—that ownership existing in any grain sold to the elevator as well as that to which there are no receipts specifying a particular type and grade of grain. In this regard the bank is quite correct since its claim under the Bankruptcy Code can prevail only to the extent that the elevator itself had an interest. Section 506(a) of the Code provides that a secured creditor's claim is allowed only to the extent of the estate's interest in the property. Ergo, if the elevator had no interest then there is nothing to which the bank's security interest could attach. In the context of the competing interests of the bank and grain receipt holders, it is the ownership interest of the elevator rather than the receipt holder which is critical to the bank's claim.

Several of the objecting parties believe that pursuant to N.D.Cent.Code § 60–04–03.1 all the grain in the elevator became part of a common trust for the benefit of receipt holders. Chapter 60–04 is wholly inapplicable in those situations where an insolvent grain warehouse chooses the route of liquidation under the United States Bankruptcy Laws. Chapter 60–04 of the North Dakota Century Code is designed to provide a prompt procedure for claims recovery by receipt holders through a process of state court appointment of the state public service commission as trustee.

Its provisions closely parallel the very objective of Chapter 7 of the Bankruptcy Code. Once a bankruptcy case is filed the bankruptcy court acquires exclusive jurisdiction over the estate created and this jurisdiction preempts state insolvency proceedings. *State of Mo. v. U.S. Bkrtcy. Court, Etc.,* 647 F.2d 768, 776 (8th Cir. 1981). Under section 541 property of the estate created by the event of a filing is comprised of virtually all legal or equitable interests of the debtor. The trust fund envisioned by N.D.Cent.Code § 60–04–03.1 would be inclusive of property coming into the bankruptcy estate and thus can have no effect in a bankruptcy context since its operation would be directly opposed to section 541.

■ Although the Bankruptcy Court has exclusive jurisdiction over the estate and the Code provides the exclusive procedure for assuming control over property belonging to the Debtor, the court must still resort to state law to determine the ownership rights of holders of documents of title and the priorities in fungible goods where, as here, there is insufficient grain of a particular type and grade to satisfy all receipt holders. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). *State of Mo., supra* at 774; *In re Schauer,* 835 F.2d 1222 (8th Cir.1987); *Nelson v. Cavalier Rural Elec. Co-op.,* 68 B.R. 910 (Bankr.N.D.1987); *In re Bearhouse, Inc.,* 84 B.R. 552, 566 (Bankr.W.D. Ark.1988).

Section 557 of the Bankruptcy Code although enacted to facilitate an expeditious determination of interests in and claims to the grain assets of a grain storage facility, does not substantively address those interests except with regards to recoverable costs. Hence, the extent to which the bank has an interest in the grain proceeds turns upon state law.

Under North Dakota Law persons who deposit grain for storage with a warehouseman are issued a receipt and a bailment is thereby created regardless of whether the receipt is a scale ticket or warehouse receipt. N.D.Cent.Code 60–02–25. A warehouse receipt by its nature is a document of title and the relationship of its holder to the warehouseman, other receipt holders and third parties is governed by the Uniform Commercial Code provisions relating to documents of title and warehouse receipts as well as by the regulatory provisions of N.D.Cent.Code Ch. 60–02 relating specifically to bailments with public seed warehouses. As defined in N.D.Cent.Code § 41–01–11(15), a "document of title" is a document issued by a bailee covering goods in his possession which are identified or which are part of an identified mass. It is well established law that the holder of a document of title retains ownership in the goods stored. Although Article 7 of the Uniform Commercial Code in § 7–207 refers only to warehouse receipts the term itself like the concept of document of title is broadly defined and addresses the ownership interest of a bailor in stored goods. N.D.Cent.Code 41–07–08(1) (U.C.C. § 7–202(1)) provides that a warehouse receipt need not be in any particular form. The concept of bailor ownership interest in a document of title is expanded by N.D. Cent.Code § 60–02–25 to include unconverted scale tickets issued for the *storage* of grain. Therefore the provisions of Article 7 when applied to grain deposited for storage in a warehouse have reference to holders of scale tickets as well as warehouse receipts. The concept becomes the same. The North Dakota Supreme Court in *North Dakota Public Serv. v. Valley Farmers,* 365 N.W.2d 528, 539 (N.D.1985) has held that "When a public warehouseman accepts grain for storage "such delivery shall become a bailment and not a sale ...". There is nothing in Article 9 of the Uniform Commercial Code that dilutes this ownership interest which is vested in a bailor. Clearly, a secured creditor's security interest does not attach until the warehouseman—bailee has rights in the goods. See N.D.Cent.Code § 41–09–16(1)(c) (U.C.C. § 9–203(1)(c). This interest never arises in bailed property. Chapter 60–02 is a statute for the regulation of grain and seed warehouses. Section 41–07–03 (U.C.C. § 7–103) as well as section 41–07–10(4) (U.C.C. § 7–204(4)) make reference to its provisions, making it clear that Article 7 must

be read in conjunction with Chapter 60–02 and to the extent they are at variance Chapter 60–02 overrides Article 7. Section 60–02–25 of the North Dakota Century Code[1] in part codifies the established law regarding the bailment relationship between a warehouseman and receipt holder to-wit: "Whenever any grain shall be delivered to any public warehouse and an uncontroverted scale ticket or warehouse receipt is issued therefor, such delivery shall be a bailment and not a sale of the grain so delivered ...". Difficulty arises where the goods stored in a warehouse are fungible in nature. N.D.Cent.Code § 41–07–13(2) (U.C.C. § 7–207(2)) provides:

> "*Fungible goods* so commingled or *owned in common* by the persons entitled thereto and the warehouseman is severally liable to each owner for that owner's share. Where because of overissue a mass of fungible goods is insufficient to meet all the receipts which the warehouseman has issued against it, the person entitled includes all holders to whom overissued receipts have been duly negotiated." (emphasis added).

This court has previously interpreted the foregoing section as meaning that persons with claims to fungible goods of equal priority are entitled to a proportionate share of the proceeds from the goods stored. *In re Jamestown Farmers Elevator, Inc.*, 49 B.R. 661, 663 (Bankr.N.D.1985). This sense of this interpretation rests upon the principal that bailors of fungible goods whether evidenced by a warehouse receipt or scale ticket become tenants in common

of the entire mass the effect of which is to defeat a warehouseman's creditor claiming a security interest in the fungible-goods. *Preston v. United States*, 696 F.2d 528, 535 (7th Cir.1982); *White & Summers*, U.C.C. § 20.5 (2d.Ed.1980). The effect according to the District Court in the case of *First Nat. Bank of Smith Center, Kan. v. Nugent*, 72 B.R. 528, 530 (D.C.Kan.1987) is that "The warehouseman cannot claim any ownership interest in the commingled mass until the other ownership interest of grain depositors/owners have been met." *See also, In Re Bucyrus Grain Co., Inc.*, 78 B.R. 296, 299 (Bankr.Kan.1987).

Section 60–02–25 makes this result clear where in the last sentence it goes on to provide, "In the event of the failure or insolvency of the warehouseman, all the grain in the warehouse, whether the same is stored or not, first shall be applied at all times to the satisfaction of receipts issued by the warehouseman." What is omitted from section 60–02–25 is any reference to fungibility. Rather, the focus is upon all the goods in storage without regard to whether they are fungible or not. Section 60–02–25.1 then gives outstanding receipt holders a first priority lien in all grain in the warehouse again without regard to its fungible quality.[2]

Owners of goods which by their nature are fungible become, under section 7–207 of the Uniform Commercial Code, tenants in common of the commingled mass by virtue of the very nature of the goods being fungible and the fact that they were

---

1. 60–02–25. **Bailment not a sale.** Whenever any grain shall be delivered to any public warehouse and an unconverted scale ticket or a warehouse receipt is issued therefor, such delivery shall be a bailment and not a sale of the grain so delivered. In no case shall the grain so delivered be liable to seizure upon process of any court in any action against such bailee, except in an action by an owner of such unconverted scale ticket or warehouse receipt to enforce the terms thereof or obtain redelivery of such delivered grain. In the event of the failure or insolvency of the warehouseman, all the grain in the warehouse, whether the same is stored or not, first shall be applied at all times to the satisfaction of receipts issued by the warehouseman.

2. 60–02–25.1. **Receipt holder's lien.** Grain contained in a warehouse, including grain owned by the warehouseman, is subject to a first priority lien in favor of outstanding receipt holders storing, selling, or depositing grain in the warehouse. The lien created under this section shall be preferred to any lien or security interest in favor of any creditor of the warehouseman regardless of the time when the creditor's lien or security interest attached to the grain. Notice of the lien created under this section need not be filed in order to perfect the lien. The lien created by this section is discharged as to grain sold by the warehouseman to a buyer in the ordinary course of business. Such sale does not discharge the lien in favor of an individual receipt holder in the remaining grain in the warehouse.

commingled. Such goods are not easily identifiable one from another and by trade usage are commonly mixed together. If such commingling and resultant loss of separateness resulted in a reduction in the amount available to satisfy the ownership interest of a bailor, then his title could be totally defeated by the wily and unscrupulous bailee/warehouseman. The tenancy in common referred to in section 41–07–13 of the North Dakota Century Code (U.C.C. § 7–207) however, is not dependent upon the fact that a warehouseman may have in storage wheat as well as corn. These are not by their nature fungible and Article 7 does not accord respective receipt holders of non-fungible commodities an ownership interest in the commodity of the other which could then be expanded into a tenancy in the entire quantity of store goods. Ownership in the entire mass (U.C.C. § 7–207) depends first of all upon a document of title (as expanded by Ch. 60–02) in a type of property which is by its nature fungible and secondly that the particular fungible property be actually commingled with others of the same type. Merely because goods are fungible does not always mean that they are commingled with other fungible goods. To the extent that section 60–02–25 and section 60–02–25.1 eliminate the element of fungibility as a basis for a right to a distributive share of the entire mass, that right is not based upon a preexisting ownership interest existing in the bailor in consequence of his warehouse receipt or scale ticket. Section 60–02–25.1 suggests that all that is necessary to give an interest in the entire stored product whether fungible or not, is an outstanding receipt or scale ticket. Thus, a holder of a corn receipt is given a lien not only in corn which is fungible with other corn and in which the holder of a corn receipt may well become a tenant in common with all other corn receipt holders, but also in grain of any type without regard to whether it was fungible and commingled with the corn placed in storage. The interest created thereby is not the kind of ownership interest addressed in Article 7 but goes beyond it and creates, in favor of a holder of a receipt in commingled fungible goods, a lien in other non-fungible and non-commingled goods which coincidentally happen to be stored in the same warehouse as the receipt holders goods.

■ The bank's interest in and to the proceeds of the grain is valid only to the extent its security interest attaches to property owned by the elevator—an ownership interest which does not exist where commingled fungible goods are insufficient to satisfy outstanding receipt holders. Even if the bank's security interest attaches to excess goods of a particular commodity type, it still stands in second priority to the blanket lien given warehouse receipt holders by section 60–02–25.1.

## 2.

COMMODITY CLASSIFICATION FOR DISTRIBUTION PURPOSES. The proceeds to be distributed are derived from seven commodity types and a wide range of grades within those types. The trustee and the bank argue that for purposes of proceeds distribution, recognition must be given to not only commodity type but grade as well. Consistent with their argument, a holder of a receipt for # 2 corn, for example, would be entitled to share in the proceeds of # 2 corn but not in proceeds of any other grade and to the extent the sale proceeds of # 2 corn might be deficient, the holder of a # 2 receipt would be merely an unsecured creditor. Most of the receipt holders disagree with this approach arguing that a bailor of farm commodities cannot control a grade or quality change due to the elevator's blending, rotation and general warehouse management practices.

■ The court believes it is appropriate to recognize a commodity differentiation between the different grains in storage. As acknowledged at the hearing by Clark Holsworth, an individual with sixteen years of experience in grain buying and selling and the individual who marketed all of the grain at issue, "You can't change corn to wheat". The particular commodities fungibility therefore must be taken into account. Under the general definition set out in N.D. Cent.Code § 41–01–11(17) (U.C.C. § 1–201(17)), "fungible" means goods of

which any unit is, by nature or usage of trade, the equivalent of any other like unit. Corn is not the fungible equivalent of wheat. Therefore, for purposes of proceeds distribution, holders of receipts are entitled to a distribution of proceeds derived from the particular commodity in which they hold a receipt. Grain, while not fungible as to type, is fungible as to grade. According to Mr. Holsworth it is common in the industry for commodities to be delivered to the elevator as # 3 or # 4 but upon being shipped out become # 1 or # 2 for a variety of reasons. This commonly occurs because an elevator can improve a grade by blending grades and cleaning. According to Holsworth it is an industry practice to blend grades to improve quality and according to his testimony all grain can be upgraded in this fashion. He also stated that grain can also deteriorate in storage and can suffer breakage due to normal handling both of which affect grade. Thus a farmer could have shipped and received a receipt for # 1 corn but upon shipment due to normal elevator handling the grade could have been reduced to # 2 or # 3.

■ In the instant case the trustee asked Mr. Holsworth to do what he could to upgrade all grain in storage and this was done by cleaning and blending. The court believes it would be fundamentally unfair to make a distribution between grades of a particular commodity due the way in which a grade can be affected by the action or non-action of the warehouseman. One would be blind to reality to deny a receipt holder of # 1 corn a right to share in the total corn proceeds merely because at sale there was insufficient # 1 corn but considerable quantities of lesser grades. Under normal elevator occurences, the # 1 corn could well have deteriorated into # 5 or been cracked in handling. The receipt holder is no less a bailor or the corn albeit of a reduced quality. The court regards receipt holders to be tenants in common of all commodities of a particular type without regard to grade. Accordingly, all receipt holders of # 1 grade receipts, for example, are entitled to receive full payment in recognition of their receipts from proceeds of that particular grade. Any deficiency is to be satisfied from the other grades of the same commodity type remaining after satisfaction of scale tickets for those grades. As an example, holders of # 2 Barley receipts should be first satisfied from # 2 proceeds with any deficiency satisfied pro rata from excesses of # 1, # 3 and sample.

3.

■ PRICING. The issue here is what price should be paid for the particular commodity appearing on the warehouse receipts. Considerable testimony was taken regarding the market prices of the particular commodities as of the date of bankruptcy filing. This issue must be viewed in recognition of the fact that it is the warehouse receipt holders and not the estate which is the owner of the commodity. Placing a price on the value of an interest in estate property as of the date of filing is appropriate when estate property is involved. But here, the sale proceeds are proceeds not of the estate's property but of the bailors' and it is they who are entitled to the proceeds. The court believes the price to be paid warehouse receipt holders is the price obtained as of the date of sale plus interest from the date of sale. Consistent with the type, grade and quantity reflected on a particular receipt together with interest. A holder of a receipt for # 1 or # 2 corn, for example, is entitled to payment for that grade and to the extent insufficient quantities of # 1 or # 2 were sold to satisfy all # 1 or # 2 receipts the difference should be made up out of # 3, # 4, # 5, sample and screenings. Holders of receipts for winter wheat, oats, and rye are to be paid consistent with their receipts to the extent sufficient proceeds (without regard to grade) exist.

Holders of receipts of a grade which was not among the grades existing at sale are nonetheless entitled to be paid for the grade reflected on the receipt.

As to non-ownership claims, the court accepts the Minneapolis market prices existing as of April 13, 1989, as being the appropriate price to be accorded claimants claiming an interest in elevator owned grain. According to Clark Holsworth, the

Minneapolis prices as of April 13, 1989, after deduction for load out charges are the following:

| | |
|---|---|
| Spring Wheat | $3.94 |
| Winter Wheat | $3.89 |
| Corn # 2 or better | $2.38 |
| Barley # 2 or better | $2.00 |
| Oats # 2 or better | $1.80 |
| Rye | $2.00 |
| Beans # 2 or better | $6.94 |
| Hard durum | $4.00 |

The trustee urged an April pricing based on Kansas City markets but according to the evidence elevators in this area typically use the Minneapolis market.

### 4.

SETOFFS. The trustee believes under section 553 that a setoff is appropriate against grain claimants and that any claim is disallowable where the claimant may be liable for a setoff or a preference. Storage charges and loadout charges are the grain specific charges the trustee believes are appropriate for setoff. Loadout charges are already factored into the price received and preferences (irrespective of § 557(h)(1)) are merely conjectural at this point as no proceedings have been commenced.

Sections 60–02–17 and 60–02–33 of the North Dakota Century Code in their reference to storage charges merely allude to the lien of warehousemen provided for by North Dakota Century Code § 41–07–15 (U.C.C. § 7–209) which accords to a warehouseman a lien against the bailor for storage, transportation, insurance, labor and expenses reasonably necessary to the preservation and sale of the goods. The storage charges specified in chapter 60–02 and the lien provided for in Article 7 of the Uniform Commercial Code are not in the nature of a section 553 setoff and as regards grain assets, must be modified in the context of bankruptcy by section 557(h)(1) of the Code which provides that the trustee may recover from the proceeds of grain assets *only* the reasonable and necessary costs and expenses allowable under section 503(b) attributable to preserving or disposing of the grain. The limitation of section 557(h)(1) takes precedence over any otherwise available bankruptcy remedy of setoff and recovery of these expenses does not hinge upon either state law or agreements between the parties. Section 547 preferences are not an expense incidental to the preservation or disposal of grain and thus are not legitimate items of "offset" under section 557. Whether or not the scale tickets or warehouse receipts provide for collection of storage charges is likewise immaterial. Section 557(h)(1) contemplates only recovery of what are normally characterized as administrative expenses rendered *after commencement of the case.* For this reason storage charges incurred pre-petition although legitimate expenses of the elevator were not incurred post-petition and are not the kind of expenses that may be recovered from grain proceeds under section 557(h)(1). Post-petition insurance, loadout charges, handling expenses, and storage expenses are legitimate expenses attributable to grain maintenance and disposal. To the extent these post-petition charges are reasonable and necessary they may be deducted from the proceeds distribution. Post-petition storage charges incurred by the elevator are an artificial expense based not upon the necessary expense of preservation and disposal of the grain, but merely incidental to liquidation of the grain assets. It is inappropriate to charge grain receipt holders with post-petition storage charges of the elevator itself.

### 5.

CONTRACTS FOR PRESENT SALE OF GRAIN, BASES FIXED, DEFERRED PRICING. A number of the grain claims [3] are premised upon a document captioned, "Contract for Present Sale of Grain, Bases Fixed, Deferred Pricing." By its terms the document states that the elevator hereby buys and the undersigned hereby sells the grain which has been delivered to the elevator. The contract provides for fixing the price based upon the Chicago future price with a time specified for the last pricing date. Upon demand the elevator is to pay

---

**3.** Anderson claim # 5; McDonald claim # 22; Lynnes claim # 28; Roland Heuer claim # 43; Roesler claims # 35, # 36, # 37 and # 38; Kellerman claim # 39; Pfingsten claims # 41 and # 42.

the seller the full purchase price. The claimants argue that irrespective of how the document is captioned, no title passed to the elevator and they remain owners of the grain delivered pursuant to the contract. The bank objects, suggesting that a sale occurred and that any scale tickets existing do not represent an ownership interest. As previously discussed in part 1 of this opinion, a scale ticket is a document evidencing title only when it is issued to a person who deposits grain for storage. It does not take on that character when issued in connection with a sale. A sale is defined in North Dakota Century Code § 41–02–06(1)(d) (U.C.C. § 2–106) consists of the passing of title from the seller to the buyer for a price. Unless otherwise explicitly agreed, title passes to a buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods. N.D. Cent.Code § 41–02–46(2) (U.C.C. § 2–401(2)). Even though the seller may receive a receipt which under section 60–02–01(7) includes a scale ticket, that scale ticket is not representative of an ownership interest where a true sale occurred—that is to say, where title passed to the buyer. No bailment is created in a sale situation and the only claim a holder of a non-storage scale ticket can make is under N.D.Cent. Code § 60–02–25.1 which goes beyond the concept of a bailment and grants a lien to the holder of any receipt whether it was for storage or sale.

The contracts in question were by their terms, present sales of grain by which the elevator took title subject only to a requirement of paying the seller upon later demand. Accordingly, the claims based upon these contracts are disallowed as claims of owners/bailors. The claimants merely retain a lien in the grain for the balance due them under the contract and otherwise are unsecured creditors of the estate. The contracts unpriced as of the date of bankruptcy filing should be priced at the Minneapolis futures prices prevailing on April 13, 1989.

6.

INSTALLMENT SALE CONTRACT. The claim of John Heuer (claim # 4) is based upon a document captioned, "Installment Sales Contract". As with the present sale contracts, this document provides that the elevator, as buyer, and the claimant as seller, agree to the sale by the claimant and the purchase by the elevator of a quantity of grain. The purchase price specified is to be paid by a particular date. The document bears every indication that the agreement was intended as a sale. Accordingly, this claim is disallowed as an owner/bailor claim against the grain fund. The document upon which the Heuer claim is based contains a credit-sale contract notice as required by N.D.Cent.Code § 60–02–19.1 which has the effect of taking the document out of the N.D.Cent.Code § 60–02–01(7) definition of "receipt". In failing to constitute a "receipt", John Heuer's claim # 4 is *not* entitled to receipt holder's lien status under N.D.Cent.Code § 60–02–25.1 and is entitled to treatment only as an unsecured claim against the general assets of the elevator.

7.

CONTRACTS FOR FUTURE DELIVERY. The claims of the Colfax Farmers Elevator (claim # 17) and Cleo Brown (claim # 56) rest upon documents captioned "Contracts for Future Delivery of Grain". The contract provides for a present purchase of a certain quantity of grain with delivery to be made later. According to Mr. Brown the reason that he entered into the contract was so that he could sell at a set price before the market fell.

Colfax Farmers Elevator became involved with the elevator in unit train assembly with the agreement memorialized by a contract for the delivery of 35,000 bushels of corn. Delivery was completed and the claimant is claiming $10,659.45 as a claim against the grain proceeds.

These contracts do not give rise to a bailment situation either. The claimants contracted for the sale of grain with delivery in the future. To the extent delivery was completed title passed to the elevator. Any scale tickets merely constitute a lien

for the balance remaining consistent with N.D.Cent.Code § 60–02–25.1 but do not represent an ownership interest. Absent a lien, the sums due these claimants merely constitute unsecured claims.

8.

CLAIM OF SHELDON FARMERS ELEVATOR. Claim # 40 of Sheldon Farmers Elevator in the amount of $16,700.08 is not represented by a written contract. According to the testimony of Sheldon's manager, it participated in a unit train with the elevator on two occasions in 1989 with the elevator acting as sales agent. The manager stated that these were sales to the elevator with an obligation on the part of the elevator to pay for the grain delivered. Clearly this delivery was not one intended for storage at the elevator. Rather, it was an arrangement whereby the elevator acted as Sheldon's sale agent for the delivery and consignment of grain to a purchaser via a unit train shipment. The scale tickets are merely representative of grain contributed to the unit train and do not represent an ownership/bailor interest in any grain which remained at the elevator. The claim of Sheldon Farmers Elevator is accordingly disallowed as an ownership claim against the grain proceeds. Sheldon Farmers Elevator yet retains a lien under section 60–02–25.1 and otherwise is an unsecured claimant against the general assets.

9.

CLAIM OF JOHN CHRISTENSEN. The claim of John Christensen (claim # 9) in the sum of $4,080.90 is not based upon a written contract. Testifying at the hearing, Mr. Christensen stated that in March and April 1989 he sold the elevator 9,036 bushels of wheat expecting to be paid as soon as the elevator had been paid by the broker, Continental Grain. Several attachments to the proof of claim refer to the elevator as the buyer and one of them provides, "Claimant states that this was a cash sale". At the hearing Mr. Christensen acknowledged the grain was never stored at the elevator.

Accordingly, the court concludes this transaction was a sale with title to the grain passing to the elevator upon delivery by the claimant. As a consequence, the scale tickets do not represent a bailor/ownership interest in the grain proceeds. The receipts merely give rise to a lien under section 60–02–25.1 of the North Dakota Century Code and otherwise the claimant has an unsecured claim for the balance due.

*Conclusion*

Distribution of the grain sale proceeds shall be made consistent with the foregoing discussion.

SO ORDERED.