**WEYERHAEUSER COMPANY, Plaintiff,**

v.

**ISRAEL DISCOUNT BANK OF NEW YORK and Crestmanor Homes, Inc., Defendants.**

No. 92 Civ. 0431 (JGK).

United States District Court, S.D. New York.

Aug. 15, 1995.

637

638

Discount Bank of New York ("IDB"), as advising bank under a letter of credit ("Letter of Credit" or "Credit") from non-party Bank Leumi Le–Israel ("Leumi"), failed to honor a partial assignment of proceeds to Weyerhaeuser made by defendant Crestmanor Homes, Inc. ("CHI"), the beneficiary of the Letter of Credit, despite having notice of the partial assignment.

The issue in this case is whether Weyerhaeuser had an effective assignment of and a perfected security interest in the partial proceeds of the Letter of Credit and was, therefore, entitled to receive payment of such partial proceeds directly from IDB, the advising bank. Weyerhaeuser has brought a claim under the New York Uniform Commercial Code as well as claims for intentional and tortious interference with contract and prima facie tort. Weyerhaeuser seeks a declaratory judgment that it holds a valid irrevocable assignment of a perfected security interest in, and the right to receipt of, 48.75 percent of all drawings made under the Letter of Credit[1] and the entry of a judgment in its favor and against IDB in the amount of 48.75 percent of all drawings made under the Letter of Credit, or $501,506.36, plus interest at the statutory rate of nine percent. Weyerhaeuser also seeks punitive damages and attorneys' fees. IDB alleges that the partial assignment of the proceeds of the Credit to Weyerhaeuser, even if made by CHI, was never either effective or perfected and that IDB properly disbursed all of the proceeds of the Credit to CHI, rather than to Weyerhaeuser.

Following a bench trial and after reviewing all of the submissions of the parties and having assessed the credibility of all of the witnesses, the Court makes the following findings of fact and conclusions of law:

David L. Goldberg, Brian Gallagher, Kronish, Lieb, Weiner & Hellman, New York City, for plaintiff.

David M. Posner, John P. McCahey, Hahn & Hessen, New York City, for defendant Israel Discount Bank of New York.

## OPINION AND ORDER

KOELTL, District Judge:

This diversity case was brought by the plaintiff Weyerhaeuser Company ("Weyerhaeuser") alleging that the defendant Israel

## I. FINDINGS OF FACT

### A. The Parties and the Basis for Jurisdiction

1. Plaintiff Weyerhaeuser is a corporation incorporated under the laws of the state of

---

1. As indicated by paragraph twenty-eight of the Joint Pretrial Order and by paragraph sixteen of the Amended Complaint, Weyerhaeuser initially contended that it was entitled to 48.75 percent of the proceeds of each drawing on the Credit distributed by IDB to CHI after November 9, 1991, the date Weyerhaeuser alleges that IDB received written notice of its alleged security interest. However, at trial, the Court permitted Weyerhaeuser to amend its complaint to allege that it is entitled to 48.75 percent of the value of the total proceeds of the Credit. (See Court Exh. 1.)

Washington, having a principal place of business in Tacoma, Washington. (JPO ¶ 1.)[2]

2. Defendant IDB is a New York banking corporation, having a principal place of business at 511 Fifth Ave., New York, NY. (JPO ¶ 2.)

3. CHI, which began operation in 1988 and was engaged in the business of manufacturing and operating prefabricated homes, is a corporation incorporated under the laws of the State of West Virginia, having formerly maintained a principal place of business in Martinsburg, West Virginia. CHI filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in November, 1992, which since has been converted to a Chapter 7 liquidation. The proceedings against CHI have been stayed pursuant to 11 U.S.C. § 362, as recognized by the Court's order dated December 15, 1992 signed by Judge Keenan.[3] (JPO ¶ 3.)

4. The amount in controversy exceeds $50,000.00, exclusive of interest and costs.

B. *The Letter of Credit, the Advice of Credit and IDB's Policies, Procedures and Routine Practice*

5. In October, 1991, Leumi issued Letter of Credit No. 90191234703241, the Credit that is at issue in this case, to CHI, as beneficiary, in the sum of $1,613,040.00, to secure the payment of modular homes sold by CHI in Israel. (JPO ¶ 5.)

6. IDB acted as the advising bank under the Letter of Credit. (JPO ¶ 6.) In this capacity, IDB would receive the documents required to be presented by CHI under the terms of the Letter of Credit, forward those documents to Leumi, await instructions from Leumi as to whether it would make payment to CHI under the Letter of Credit, receive from Leumi or its agent the funds to be paid by Leumi to CHI pursuant to the Letter of Credit and disburse such funds to CHI. (Fisher Aff. ¶ 3.)[4]

7. As advising bank, IDB had no claim to, or interest in, the proceeds to be paid under the Letter of Credit. (JPO ¶ 7.)

8. IDB's policies and procedures require that all documents presented in connection with a request for payment be checked against the particular credit by two different documentary examiners who complete a work or instruction sheet noting the date upon which they performed their check. Following the checks, the documents are forwarded to the appropriate party, usually the issuer, with a covering letter from IDB which, if appropriate, sets forth any discrepancies and requests that the party to whom the documents are sent do some specified act, such as accept the documents, waive the discrepancies or provide instructions to IDB. (Marin Aff. ¶ 4; Serrano Aff. ¶ 4; Tedeschi Aff. ¶ 3.)

9. Once IDB has received authority from the issuer to make payment, but before payment is made, the documents in the file are checked by two different documentary examiners who usually note their work on a separate work or instruction sheet. IDB then makes the appropriate payment, the documentary examiner handling the payment notes the date, the payment and his or her initials on the binder liability sheet, (*see, e.g.,* Def.'s Exh. LLL), and the documentary examiner endorses down or notes the payment on the original letter of credit. (Marin Aff. ¶ 5; Serrano Aff. ¶ 5; Tedeschi Aff. ¶ 4.)

10. IDB's policies, procedures and routine practice then require that the original letter of credit be returned to the beneficiary by regular mail unless the beneficiary directs that it be returned by a different manner or unless payment is made by express mail, in which case the original letter of credit is returned with the payment. Employees known as "splitters," who are in the "typing section" or "mailing section," are responsible for "breaking down" the work sheets and the

2. *"JPO" refers to the Joint Pretrial Order submitted by the parties and signed by the Court in connection with the trial in this action.*

3. This case was transferred from Judge Keenan to this Court on November 15, 1994.

4. All citations to witnesses' affidavits are to affidavits submitted by agreement of the parties in lieu of direct testimony at trial. Each witness whose affidavit was received in evidence was presented at trial for cross-examination, redirect testimony and questioning by the Court.

instructions, typing the advices and the necessary tickets, checking the amounts to ensure that they add up and actually mailing the original letter of credit back to the beneficiary. (Marin Aff. ¶ 5; Serrano Aff. ¶ 5; Tedeschi Aff. ¶ 4; Trial Tr. 258–62.)

11. IDB acts as advising bank on approximately five hundred credits per year, IDB's Letter of Credit Department handles the issuance of approximately five thousand credits per year and the documentary examination area of the Letter of Credit Department handles approximately twenty to twenty-two thousand draw requests per year in connection with letters of credit for which IDB acts as either issuing bank, or advising or confirming bank, or both. (Zorn Aff. ¶ 6.)

12. On October 15, 1991, prior to advising the Letter of Credit, IDB received a telex transmission ("Telex") from Leumi which set forth the terms, conditions and instructions for the Letter of Credit to be issued by Leumi to CHI. (JPO ¶ 8.) In accordance with IDB's standard practice, the Telex was given to the issuance area of the Letter of Credit Department where it was logged in, assigned a reference number and reviewed. The original Telex was retained in IDB's files. (JPO ¶ 9.)

13. After authenticating the Telex, on October 23, 1991, the issuance area of the Letter of Credit Department at IDB prepared an advice of credit ("Advice of Credit"). (JPO ¶ 10.)

14. The original Advice of Credit, bearing the original signature of one IDB officer, together with an attached copy of the Telex, constitutes the original credit ("Original Credit"). (Fisher Aff. ¶ 13; Rosenwasser Aff. ¶ 9; Zorn Aff. ¶ 17.)

15. It is IDB's policy, procedure and routine practice that the Original Credit, which is required to be presented by the beneficiary prior to each payment, is not retained by IDB in its files, but is forwarded to the beneficiary. A copy of the Original Credit is maintained by IDB in its files. (Fisher Aff. ¶ 13; Marin Aff. ¶ 7; Tedeschi Aff. ¶ 15; Zorn Aff. ¶¶ 17, 21.) IDB does not, as part of its established practice and procedure, attach a cover letter to the original credit or

maintain any particular notation in its files when it forwards the original credit to the beneficiary. (Trial Tr. at 154–55.)

16. Weyerhaeuser never took physical possession of the Original Credit. (JPO ¶ 13.)

C. *Shipments, Authorizations and Drawings on the Credit*

17. Consistent with IDB's policies, procedures and routine practice, CHI, as beneficiary, was required to present to IDB the Original Credit prior to receiving each payment under the Credit. (Fisher Aff. ¶ 3; Tedeschi Aff. ¶ 15; Zorn Aff. ¶ 21.)

18. At the time the Original Credit was prepared by IDB on about October 23, 1991, CHI already had shipped the first three shipments of modular homes to Israel and CHI already had forwarded to IDB the documents necessary to be presented by CHI to obtain the first three payments under the Letter of Credit. Therefore, rather then forward the Original Credit to CHI, in accordance with its policies, procedures and routine practice, IDB maintained the Original Credit in its possession until November 7, 1991, the date the first payment ("First Payment") was sent by IDB to CHI. (JPO ¶¶ 11, 12; Fisher Aff. ¶ 14; Rosenwasser Aff. ¶¶ 5, 6, 10, 13; Serrano Aff. ¶ 14; Tedeschi Aff. ¶ 10.)

19. CHI made the first shipment of modular homes to Israel on September 4, 1991. IDB wrote to Leumi to request a reimbursement for the first shipment on October 29, 1991. (JPO ¶¶ 14–16.)

20. On November 7, 1991, CHI directed IDB in writing that the First Payment, when authorized by Leumi and forwarded to IDB, be paid to CHI by check sent to CHI's West Virginia office. There was no mention in these instructions of either Weyerhaeuser or an assignment. (JPO ¶ 26; Def.'s Exh. AA.)

21. On November 7, 1991, the First Payment, in the amount of $342,451.07, authorized by Leumi, was sent by Federal Express from IDB to CHI in the form of an official IDB check. (JPO ¶ 27.) Upon disbursement of the First Payment on November 7, 1991, IDB endorsed down the amount of the payment on the Original Credit. IDB

then forwarded the Original Credit by Federal Express on November 7, 1991, together with the First Payment, to CHI at CHI's address in Martinsburg, West Virginia as set forth in the Credit and the written instructions received from CHI. (Serrano Aff. ¶ 12.)

22. CHI made the second shipment of modular homes to Israel on September 29, 1991. IDB wrote to Leumi to request a reimbursement for the second shipment on November 1, 1991. (JPO ¶¶ 17, 18.)

23. By facsimile dated November 28, 1991, CHI directed IDB in writing that the second payment ("Second Payment") be made by check sent to CHI by Federal Express. There was no mention in this facsimile of either Weyerhaeuser or an assignment. (JPO ¶ 40; Def.'s Exh. CC.)

24. Thereafter, by facsimile dated December 3, 1991, CHI directed IDB that the Second Payment be made by electronic transfer to CHI's account at Old National Bank ("ONB"). There was no mention in this facsimile of either Weyerhaeuser or an assignment. (JPO ¶ 41; Pl.'s Exh. 59.)

25. On December 3, 1991, the full amount of the Second Payment, in the amount of $343,180.00, approved by Leumi and disbursed through IDB, was sent by wire transfer by IDB to CHI's account at ONB. (JPO ¶ 42.) Consistent with IDB's policies, procedures and routine practice, the Original Credit was presented by CHI to IDB prior to the disbursement of the Second Payment. (Marin Aff. ¶ 19; Serrano Aff. ¶ 9.)

26. Subsequent to its receipt of the Second Payment, CHI paid Weyerhaeuser, from the proceeds of the Second Payment, the sum of $138,861.56. (Def.'s Exh. JJ.)

27. According to CHI's checking account statements for December, 1991 maintained by ONB, on December 3, 1991, CHI received the proceeds of the Second Payment and, by check number 8474, which cleared on December 18, 1991, the sum of $138,861.56 was disbursed by CHI to Weyerhaeuser. Weyerhaeuser admitted in its original complaint that "[i]n December, 1991, [Weyerhaeuser] did obtain a payment of $138,861.56 directly from CHI, which claimed that these funds came from a December 7, 1991 drawing under the Letter of Credit." (*See* Complaint ¶ 18; Def.'s Exhs. AAA, JJ.)

28. Consistent with IDB's policies, procedures and routine practice, upon making the Second Payment, IDB endorsed down the amount of the payment on the Original Credit. The Original Credit then was returned by IDB, by first class mail, to CHI to at CHI's Martinsburg, West Virginia address set forth in the Credit and the written instructions received from CHI. (Marin Aff. ¶ 19.)

29. CHI made the third shipment of modular homes to Israel on October 16, 1991. IDB wrote to Leumi to request a reimbursement for the third shipment on November 7, 1991. (JPO ¶¶ 19, 20.)

30. By facsimile sent on January 7, 1992, CHI directed IDB that the third payment ("Third Payment") be sent by electronic transfer to CHI's account at ONB. There was no mention in this facsimile of either Weyerhaeuser or an assignment. (JPO ¶ 48; Pl.'s Exh. 69.)

31. On January 7, 1992, the full amount of the Third Payment, in the amount of $343,100.00, was approved by Leumi and disbursed through IDB, by wire transfer, to CHI's account at ONB. (JPO ¶ 49.) Consistent with IDB's policies, procedures and routine practice, the Original Credit was presented by CHI to IDB prior to the disbursement of the Third Payment. (Marin Aff. ¶ 19.) Upon disbursement of the Third Payment by IDB on January 7, 1992, the amount of the payment was endorsed down on the Original Credit and the Original Credit was returned by IDB, by first class mail, to CHI at the same address as the first two payments. (*Id.*)

32. On or about October 30, 1991, November 15, 1991 and November 26, 1991, IDB sent to CHI, by first class mail, to its Martinsburg, West Virginia address, amendments to the Credit. Each amendment consisted of an advice cover letter signed by one IDB officer or manager and a copy of the cable of the amendment received from Leumi. Copies of the amendments are maintained by IDB in its files. (Fisher Aff. ¶ 16.)

On November 13, 1991, IDB cabled to Leumi to confirm that the Credit was operative. (*Id.*) On November 15, 1991, Leumi confirmed that the Credit was operative and IDB advised CHI of this by mailing an amendment to CHI. (Fisher Aff. ¶ 17.)

33. In all, three payments were approved by Leumi and disbursed to CHI by Leumi through IDB: $342,451.07 on November 7, 1991, the First Payment; $343,180.00 on December 3, 1991, the Second Payment; and $343,100.00 on January 7, 1992, the Third Payment. (JPO ¶ 23.) [5]

34. While Weyerhaeuser argues that IDB simply kept the Original Credit and did not return it to CHI after each payment, I find that the Original Credit, which was required to be presented to IDB by CHI before each payment, was, in fact, returned after each payment. As all of the IDB witnesses testified, that was the standard practice and it was done as a matter of routine. There was no practice of creating memoranda or correspondence when the credits were returned and there were no such memoranda or correspondence in this case. However, there also were no memoranda or correspondence indicating that this routine practice was not followed in this case and each of the witnesses testified—although they could not recall the details—that they followed the standard practice. There were no instructions or documents directing them to deviate from their usual practice and there was no testimony that any of the IDB witnesses did deviate from their standard practice. I find that these witnesses, with their consistent and corroborating testimony on this point, were credible.

D. *The Purported Assignment of Part of the Proceeds of the Credit*

35. In the fall of 1991, Weyerhaeuser was owed approximately $1.5 million from CHI for building products sold to it by Weyerhaeuser. (JPO ¶ 29.) CHI was in financial difficulty and was unable to make payments to Weyerhaeuser and its other creditors, including Old National Bank ("ONB"), its lending bank, to whom it owed five million dollars. ONB held a lien on the assets of CHI to secure the CHI indebtedness to it. (Def.'s Exhs. A–F, LL, TT, YY; Stein Depo. at 14–24, 33; Sundahl Depo. at 23; Warrick Depo. at 41.)

36. Sometime on or after October 24, 1991, Daniel R. Sundahl ("Sundahl"), president of CHI, signed a letter that was back-dated to October 4, 1991, addressed to Moshe Rosenwasser ("Rosenwasser") of IDB ("Sundahl letter") which reads, in relevant part:

> We are the beneficiary of Bank of Leumi Letter of Credit No. 90191234703241 dated 10/15/91 in the amount of USD 1613040 and herewith issue to you irrevocable instructions to disburse 48.75% of the proceeds at the time of our drawings under this L/C up to the maximum of 48.75% of the total value of the Letter of Credit and remit [by Fed wire to Weyerhaeuser Settlement Account]. . . .
>
> Please acknowledge below your acceptance of these proceed distribution instructions and return to us the signed extra copy of this letter.

(JPO ¶ 30; Pl.'s Exh. 3; Def.'s Exhs. P, X.)

37. CHI sent the Sundahl letter to Weyerhaeuser. (JPO ¶ 33.)

38. Sundahl also signed a Security Agreement and UCC–1 Form Financing Statement in favor of Weyerhaeuser covering the Security Agreement and the Sundahl letter. The Security Agreement was filed with the Secretary of State of the State of West Virginia on November 1, 1991. (JPO ¶¶ 31, 32; Pl.'s Exhs. 2, 4.)

E. *Notice to IDB of the Sundahl Letter*

39. While IDB denies receipt of the Sundahl letter prior to January, 9, 1992, (Def.'s Exh. SS), and it is undisputed that IDB did not acknowledge its acceptance of the pro-

---

**5.** CHI made a partial fourth shipment of modular homes to Israel on November 11, 1991. IDB wrote to Leumi to request a reimbursement for the partial fourth shipment on November 21, 1991. (JPO ¶¶ 21, 22.) Leumi did not approve IDB's request for a fourth payment and no pay-ment was made. Moreover, no further payments have been made under the Letter of Credit and IDB has been advised by Leumi that there will be no further payments made under the Letter of Credit. (JPO ¶¶ 24, 25.)

ceed distribution instructions, I find that on November 8, 1991, Phil Warrick ("Warrick"), Weyerhaeuser's Regional General Manager, sent the Sundahl letter, by Federal Express, to Rosenwasser, along with a cover letter that provides, in pertinent part:

> Please execute the attached agreement regarding the Letter of Credit No. 90191234703241 dated October 15, 1991 in the amount of USD 1613040 as per our agreement.
>
> Thank you for your prompt attention to this matter.

(Pl.'s Exh. 6; Trial Tr. at 121–25.)

40. At 10:28 a.m. on Saturday, November 9, 1991, the Federal Express package was received at IDB's corporate offices and was signed for by a security guard employed by IDB. On Tuesday, November 12, 1991, the package was delivered to a page employed by IDB. The security guard was authorized to accept and sign for the package and it was part of the page's duties to receive Federal Express packages sent to the corporate lending department when the addressees were not in or were otherwise unavailable. (JPO ¶¶ 35, 36.)

41. While IDB denies that it received the Sundahl letter prior to January 9, 1992, (Def.'s Exh. SS), the evidence is clear that it did, in fact, receive that letter on November 9, 1991. Warrick testified that he sent the letter, (Warrick Depo. at 8–9, 11–13, 17), the Federal Express evidence indicates that the letter was received, (Pl.'s Exh. 7), and the subsequent IDB and Weyerhaeuser documents make sense only in the context of IDB's having received the Sundahl letter.

42. IDB also argues that there was an agreement among Lindan Wharton ("Wharton"), Credit Manager, and Warrick of Weyerhaeuser, and Sundahl of CHI, that Sundahl would sign the Sundahl letter and provide it to Weyerhaeuser but that the Sundahl letter would *not* be sent to IDB. IDB argues that this was done because while Weyerhaeuser was pressuring CHI for security for the money that it was owed by CHI, Sundahl was aware that under its loan agreements with ONB, CHI could not assign the proceeds of the Letter of Credit to Weyerhaeuser. IDB alleges that the Sundahl letter was provided to Weyerhaeuser as a form of security with the understanding that it would not be sent to IDB and Weyerhaeuser would not seek to recover payment of any proceeds directly from IDB; CHI then would pay Weyerhaeuser the agreed-upon percentages when it received proceeds under the Letter of Credit. (IDB's Proposed Findings ¶¶ 65–76.)

43. However, both Wharton and Warrick denied that there was any such agreement, (Trial Tr. at 30, 34, 69; Warrick Depo. at 8, 10, 23, 47), and their testimony, which I credit, is supported by the evidence that the Sundahl letter was sent to IDB at several different times as well as by the fact that Weyerhaeuser filed a financing statement with respect to the alleged assignment. Plainly, Weyerhaeuser would not file a financing statement with respect to an arrangement that was intended to be kept a secret.

44. Following his receipt of the Sundahl letter, on November 13, 1991, Rosenwasser handwrote a memorandum to Sundahl on a "buck slip" ("Rosenwasser buck slip") which reads: "Sorry, I cannot assign proceeds as L/C is both conditional (on inspection) and open ended." (JPO ¶ 37; Pl.'s Exh. 8.) It appears that Rosenwasser simply returned the Sundahl letter to Sundahl with the buck slip. (Wharton Depo. at 324–25; Pl.'s Exh. 8.)

45. Subsequent to Sundahl's execution of the Sundahl letter, CHI continued to direct IDB to pay all the proceeds to be drawn under the Credit to its account at ONB and CHI made no mention of Weyerhaeuser or an assignment of proceeds. (Def.'s Exhs. AA, CC, OO, PP, UU.)

46. Between November 6, 1991 and January, 1992, Wharton had frequent telephone conversations with Rosenwasser. On November 18, 1991, Wharton had a brief telephone conversation with Herbert Zorn of IDB ("Zorn"). Wharton never spoke to, nor attempted to speak to, anyone else at IDB. (Wharton Depo. at 640–41; Rosenwasser Aff. ¶¶ 15, 16, 17, 20; Zorn Aff. ¶¶ 23, 24.)

47. On December 3, 1991, and prior to the Second Payment, Rosenwasser advised Wharton that the Second Payment would be

made that day through IDB by wire transfer of funds to CHI's account at ONB. (Rosenwasser Aff. ¶ 22; Def.'s Exhs. EE, CC at 338–43.)

48. Wharton took no action to stop the Second Payment from being disbursed to CHI. (Rosenwasser Aff. ¶ 23; Wharton Depo. at 341–45.)

49. Although Weyerhaeuser now claims that IDB wrongfully refused to pay directly to it a portion of the Second Payment, neither Wharton nor Warrick made mention of this failure in their memoranda to their superiors subsequent to the Second Payment. (Wharton Depo. at 341–46, 411–25; Def.'s Exhs. FF, GG, II.)

50. By letter dated December 20, 1991, Wharton wrote to CHI, claiming that CHI's diversion to itself of the Second Payment placed it in default of their security agreement with respect to the assignment of a percentage of the proceeds of the Letter of Credit. IDB was not copied on the letter. The letter provides:

> This is to notify you that Crestmanor Homes is in default of our security agreement dated October 4, 1991. This agreement specifically stated that Weyerhaeuser was to receive 48.75% of the proceeds of your L/C No. 90191234703241 through irrevocable instructions provided to the advising bank, Israel Discount Bank (IDB). Unfortunately, this has not transpired. The first two draws have been disbursed directly to Crestmanor and funds have been diverted elsewhere than our agreement.
>
> As has been recently discussed, Crestmanor is pursuing opening an account with IDB with Weyerhaeuser as a co-signor [sic] on the account, thus providing us with the means of executing this security agreement. This must be completed no later than December 31, 1991 or we will pursue our options as outlined in the aforementioned agreement.

(JPO ¶ 45; Def.'s Exh. KK.)

51. Significantly, this letter does not assert that IDB, who was not copied on the letter, wrongfully had failed to pay Weyerhaeuser; rather, it suggests a mechanism—a joint account between CHI and Weyerhaeuser maintained at IDB—which would allow payment immediately to Weyerhaeuser.

52. While IDB denies receipt of the Sundahl letter prior to January 9, 1992, (Def.'s Exh. SS), following Warrick's sending the Sundahl letter by Federal Express on November 8, 1991, Wharton wrote to Perla Michane of IDB, by letter dated December 30, 1991, enclosing the Sundahl letter. This letter provides, in relevant part:

> Enclosed please find a copy of Crestmanor Homes, Inc. letter of irrevocable instructions dated October 4, 1991, to Israel Discount Bank (IDB) regarding the disbursement of proceeds on the above mentioned L/C. This letter has yet to be acknowledged by IDB, with no reasonable explanation given. In discussing this with Mr. Rosenwasser, who has been very helpful, we found the decision was made by Mr. Herb Zorn in your L/C department. Unfortunately, Mr. Zorn was not helpful at all, and in some instances, very unprofessional. We are at [a] loss as to this response.
>
> At this time, documents are being presented and proceeds are being disbursed. We would sincerely appreciate any assistance you could provide in this situation.

(JPO ¶ 46; Pl.'s Exh. 12.)

53. By letter dated December 31, 1991, Zorn responded to Weyerhaeuser's December 30, 1991 letter as follows:

> Reference is made to your letter of December 30, addressed to Ms. Perla Michane in which you referred to Crestmanor Homes, Inc., beneficiary of Bank Leumi L/C No. 90191234703241 dated October 15, 1991.
>
> You stated that you were enclosing a copy of irrevocable instructions dated October 4, 1991 from Crestmanor Homes, Inc. to Israel Discount Bank (IDB), regarding a disbursement of proceeds, yet there wasn't any copy enclosed. In any event, as a matter of proper procedure, we are not in a position to discuss any transaction with Weyerhaeuser in which they are not a participant.

May we suggest that you direct your future inquiries concerning the letter in question to Crestmanor Homes, Inc., since you have indicated that they were the originator of the October 4, letter.

(JPO ¶ 47; Pl.'s Exh. 13.)

54. By letter dated January 9, 1992, Weyerhaeuser, by its attorneys, wrote to IDB and demanded that IDB honor the Sundahl letter. (Def.'s Exh. RR.) The same day, IDB responded to Weyerhaeuser's letter by stating that it had no record of receiving the Sundahl letter and that Weyerhaeuser should direct its concerns to CHI. (Def.'s Exh. SS.)

### F. Subsequent Events

55. On two different dates in January, 1992, ONB held CHI in default. (Def.'s Exhs. YY at 19–20, Stein Depo. at 56–57.)

56. On January 22, 1992, ONB wrote to IDB to advise IDB that it possessed a lien on the assets of CHI and a security interest in the Letter of Credit and directed that all future payments made under the Letter of Credit be sent to ONB. (Def.'s Exh. TT.)

57. Also on January 22, 1992, CHI faxed instructions to IDB that unless specifically notified otherwise by either Sundahl or John Snodgrass of CHI, all future payments under the Credit were to be made by a bank check or an official check sent by Federal Express to CHI's corporate offices in Martinsburg, West Virginia. (Def.'s Exh. PP.)

58. On January 23, 1992, Sundahl wrote to IDB and directed that all future disbursements be sent by wire transfer to CHI's account at Jefferson National Bank. (Def.'s Exh. UU.)

59. During the first week of January, 1992, Weyerhaeuser terminated Warrick's employment. (Desmond Depo. at 156–60; Def.'s Exh. III.) On February 19, 1992, CHI

terminated Sundahl's employment. (Sundahl Depo. at 19; Wharton Depo. at 117.) In August, 1992, Weyerhaeuser terminated Wharton's employment. (Trial Tr. at 91.)

## II. CONCLUSIONS OF LAW

The legal issues that must be resolved in this case are: (1) whether Weyerhaeuser held an effective assignment of 48.75 percent of the proceeds of the Credit on December 3, 1991 and on January 7, 1992, the dates IDB made the Second and Third Payments under the Credit ("Payment Dates") to CHI; (2) whether Weyerhaeuser held a perfected security interest in the proceeds of the Credit on the Payment Dates; and (3) whether IDB improperly disbursed the Second and Third payments to CHI. The parties agree that Sections 5–116(2) and 9–305 of the New York Uniform Commercial Code govern the determination of the issues in this case.[6]

1. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds $50,000.00, exclusive of interest and costs.

2. At common law, an assignee effected an assignment simply by providing notice of the assignment to third parties. *See, e.g., General Motors Accept. Corp. v. Albany Water Bd.*, 187 A.D.2d 894, 896, 590 N.Y.S.2d 312, 313 (3d Dep't 1992).

3. The New York Uniform Commercial Code, however, imposes an additional requirement for an effective assignment—it requires delivery of the letter of credit, or of the advice of credit, to the assignee. Section 5–116 provides, in relevant part:

(2) Even though the credit specifically states that it is nontransferable or nonassignable the beneficiary may before perfor-

---

**6.** While the Letter of Credit states that it is governed by the Uniform Customs and Practices for Documentary Credits, 1983 Revision, International Chamber of Commerce Publication No. 400 ("UCP"), "[a]nalogies to the New York Uniform Commercial Code ("UCC") may be drawn, but only to the extent that it does not conflict with the UCP." *Weyerhaeuser v. Israel Discount Bank*, 872 F.Supp. 44, 46 (S.D.N.Y.1994) (Keenan, J.) (citing *Algemene Bank Nederland, N.V. v.*

*Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S.*, 748 F.Supp. 177, 181 (S.D.N.Y.1990) (Leval, J.)), *amended*, No. 92 Civ. 0431, 1994 WL 685487 (S.D.N.Y. Dec. 7, 1994). The parties agree that because the UCP is silent on the issue of when an assignment of proceeds vests, Section 5–116 of the New York Uniform Commercial Code governs the assignment of proceeds of letters of credit. *See id.*

mance of the conditions of the credit assign his right to proceeds. Such an assignment is an assignment of an account under Article 9 on Secured Transactions and is governed by that Article except that:

> (a) the assignment is ineffective until the letter of credit or advice of credit is delivered to the assignee which delivery constitutes perfection of the security interest under Article 9; and

> (b) the issuer may honor drafts or demands for payment drawn under the credit until it receives a notification of the assignment signed by the beneficiary which reasonably identifies the credit involved in the assignment and contains a request to pay the assignee; and

> (c) after what reasonably appears to be such a notification has been received the issuer may without dishonor refuse to accept or pay even to a person otherwise entitled to honor until the letter of credit or advice of credit is exhibited to the issuer.

N.Y.U.C.C. § 5–116(2) (McKinney 1991).

■ 4. Therefore, under Section 5–116(2)(a), delivery of the credit to the assignee, irrespective of notice, is a prerequisite to the effectiveness and perfection of an assignment of the proceeds of a letter of credit. *See* N.Y.U.C.C. § 5–116(2)(a), comment 3 (McKinney Supp.1995) ("[T]he special nature of the letter of credit as evidence of the right to proceeds is recognized by the ... requirement of delivery of the letter to the assignee as a condition precedent to the perfection of the assignment."); *see also Union Planters Nat'l Bank. v. World Energy Sys. Assocs.,* 816 F.2d 1092, 1095 (6th Cir.1987); *Weyerhaeuser v. Israel Discount Bank,* 872 F.Supp. 44, 46–47 (S.D.N.Y.1994) (Keenan, J.), *amended,* No. 92 Civ. 0431, 1994 WL 685487 (S.D.N.Y. Dec. 7, 1994).

■ 5. With respect to what documents must be delivered to satisfy the delivery requirement of Section 5–116(a), in denying IDB's motion for summary judgment, the Court [7] held:

[F]or purposes of the UCC Section 5–116(2)(a) delivery requirement, if the advising bank issues a written advice to the beneficiary of a letter of credit as to the issuance of the letter of credit, and if the advising bank requires the beneficiary to present the written advice each time it seeks to draw on the letter of credit, then the written advice is the document that must be delivered to the assignee in order to secure payment under the letter of credit.

*Weyerhaeuser,* 872 F.Supp. at 47 (citing J. Dolan, *The Law of Letters of Credit* ¶ 10.04[b], at 10–24 (2d ed.1991) (hereinafter *"Letters of Credit"*)). This holding represents the law of the case and is an accurate statement of the applicable law. *See Letters of Credit* ¶ 10.04[b], at 10–26.

6. In a case where there are partial assignments, or multiple assignees, it is impossible for all of the assignees to perfect their interests with actual possession of the letter of credit; however, this problem can be resolved where a bailee holds the letter of credit on behalf of multiple assignees. *See Letters of Credit* ¶ 10.04[b], at 10–26, 10–27 ("Article 9 of the Code permits the beneficiary to let one assignee hold the credit and to notify that party of the other assignments. There should be no question that the party holding the credit is a bailee to whom notice may be given in order to effect perfection of the security interest of the subsequent assignees."); 6C William D. Hawkland, Tom L. Holland, *Uniform Commercial Code Series* § 5–116:02 at 230 (1993) (hereinafter *"UCC Series"*) ("[T]he security interest of suppliers taking fractional assignments can be perfected by delivering the letter of credit to a bank to be held by the bank as bailee and by giving the bank notice of the fractional assignments.").

■ 7. Where delivery under Section 5–116(a) is made to a bailee, the security interest is perfected at the time the bailee receives notice of the secured party's interest.

---

7. Judge Keenan ruled on IDB's motion for summary judgment prior to the transfer of the case to this Court.

*See* N.Y.U.C.C. § 9–305 (McKinney 1990) [8]; *see also Union Planters,* 816 F.2d at 1095–96; *Weyerhaeuser,* 872 F.Supp. at 48.

8. "Since Article 9 of the Uniform Commercial Code does not define 'bailee', courts look to state law to determine the definition." *In re Atlantic Computer Sys. Inc.,* 135 B.R. 463, 466 (Bankr.S.D.N.Y.1992). "Bailment is generally defined as 'a delivery of personal property for some particular purpose ... upon a contract, express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it.'" *Id.* (citing *Rich v. Touche Ross & Co.,* 415 F.Supp. 95, 99 n. 2 (S.D.N.Y.1976)).

9. In *Union Planters,* Union Planters National Bank ("Union Planters"), the advising bank and assignee of partial proceeds under a letter of credit, was found to be a bailee for other assignees of partial proceeds under the letter of credit. *Union Planters,* 816 F.2d at 1093–96. In that case, the beneficiary of the letter of credit had made twelve partial assignments of proceeds under the letter of credit, including a partial assignment to Union Planters as well as assignments to third-party assignees. *Id.* at 1094. There, Union Planters had actual possession of the original letter of credit, which was required to be presented by the beneficiary for payment. *Id.* When the beneficiary made a partial assignment, it would notify Union Planters and Union Planters would notify the assignee. *Id.* In concluding that the assignments to the third-party assignees were effective despite the fact that there had been no "delivery" to them of the original

letter of credit, the court noted that Union Planters had received notice of the beneficiaries' assignments, had agreed to be bound by the terms of such assignments and had notified the various assignees of the assignments. *Id.* at 1096. Moreover, none of the third-party assignees objected to Union Planters' acting on their behalf and there was no conflict of interest between Union Planters and the other assignees because the proceeds of the letter of credit were sufficient to cover all of the assignments. *Id.* Thus, the court found that there was appropriate notice under Section 9–305 and that Union Planters was a bailee. *Id.*

10. Here, on the other hand, the evidence has shown that, pursuant its policies, procedures and routine practice, IDB required CHI to present the Original Credit, which was comprised of the original Advice of Credit and a copy of the Telex, before each payment. IDB did not, as Union Planters did, hold the Original Credit in its possession at all times; if it had, as the Court recognized previously, IDB may have been a bailee for CHI and, after notice of the assignment, for Weyerhaeuser to the extent of Weyerhaeuser's interest in the proceeds of the Letter of Credit. *Weyerhaeuser,* 872 F.Supp. at 48.

11. However, in this situation, where the Original Credit was returned to the beneficiary after each payment, no bailment was created by virtue of IDB's transient possession of the Original Credit during the periods of time that it processed the payments of proceeds.[9] Weyerhaeuser directs the Court

---

8. Section 9–305 provides, in pertinent part:

   A security interest in letters of credit and advices of credit (subsection (2)(a) of Section 5–116), goods, instruments, other than certificated securities, money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this Article.

N.Y.U.C.C. § 9–305 (McKinney 1990). As the comment to the statute indicates, "this rule rejects the common law doctrine that it is necessary for the bailee to attorn to the secured party or acknowledge that he now holds on his behalf." N.Y.U.C.C. § 9–305, official comment 2.

9. Weyerhaeuser's argument that the Court's decision denying IDB's motion for summary judgment supports its position that IDB could be considered a bailee each time it "held" the Original Credit which was presented by CHI in connection with each payment misreads the Court's prior opinion. In denying summary judgment, the Court noted:

   [S]ummary judgment is ... inappropriate in this case because plaintiff has shown that a

to cases finding a bailment relationship where a party exercised a sufficient degree of control over the collateral to make that party a bailee. *See, e.g., Atlantic Computer,* 135 B.R. at 469 (lessee of computer equipment had sufficient control over the collateral to be a bailee despite the lessor's "retention of a degree of control in the [l]eases" in connection with its reversionary interest); *Landmark Land Co., Inc. v. Sprague,* 529 F.Supp. 971, 980 (S.D.N.Y.1981) (Gagliardi, J.) ("Where . . . the senior secured party in possession of the collateral acknowledges and accepts the instructions of the pledgor to deliver the collateral to the junior secured party after the debt to the senior secured party is satisfied, then the senior secured party is considered to possess the collateral as the agent or bailee of the junior secured party.") (citations omitted), *rev'd on other grounds,* 701 F.2d 1065 (2d Cir.1983). However, in each of those cases, the bailee exercised continuing control over the bailment which IDB clearly did not have in this case.[10]

■ 12. In sum, mere notice by a purported assignee of a partial assignment of the proceeds of a letter of credit given to an advising bank when the advising bank simply processes the credit and holds it only for the short periods of time during which it processes payments, does not make the advising bank a bailee and does not perfect the purported assignee's security interest.

13. A contrary ruling would eviscerate the delivery and presentment requirements

material issue of fact exists as to whether or not CHI held the advice of credit and was required to present the document each time it sought payment under the letter of credit. IDB claims that it sent the advice of credit to CHI after the November 7, 1991 payment, and that it required CHI to present the advice of credit in order to secure payment under the letter of credit. After noting the amount of each payment on the advice of credit, IDB contends that it returned the written advice of credit to plaintiff after each payment. Plaintiff, however, points out the inconsistencies in the deposition testimony of IDB employees, and suggests that IDB, not CHI, held the advice of credit. *If this can be proved, then plaintiff may conceivably show that IDB held the document as a bailee to CHI and—following the November 9, 1994 notification—to plaintiff because IDB's consent to a bailment with plaintiff would not be required. . . .* *Weyerhaeuser,* 872 F.Supp. at 48 (emphasis added) (citations omitted). The clear import of the Court's opinion is that Weyerhaeuser may have been able to prove that IDB held the Advice of Credit as a bailee *if* it proved that IDB held the Advice of Credit throughout the period of the payments and that IDB did not return the Advice of Credit to CHI following each payment. The Court did not suggest that Weyerhaeuser might be able to establish a bailment by virtue of IDB's temporary possession of the Advice of Credit in connection with each payment with notice of a purported assignment. Indeed, the thrust of Judge Keenan's opinion is that if, as the Court now finds, IDB followed its regular practice of both requiring presentment of the Original Credit prior to each payment and sending the Original Credit back to CHI after each payment, no bailment was created.

10. Because no bailment was created in the circumstances of this case, it is unnecessary to decide whether the consent of IDB was required

as a prerequisite to a bailment. IDB argues that because the Sundahl letter was never signed by someone at IDB and returned to CHI, as the Sundahl letter itself requested that it be, IDB cannot be considered a bailee. However, a bailee need not consent or voluntarily assume the status of a bailee. *See, e.g., In re Housecraft Indus., USA, Inc.,* 155 B.R. 79, 89, 92 (Bankr. D.Vt.1993) (noting, in the context of a pledge, that Section 9–305 represents a change from the common law which required a bailee's consent and that "according to the clear statutory language of § 9–305, unilateral notice to a bailee perfects the interests of a pledgee in the collateral, regardless of whether the parties enter into a written agreement[]") (citation omitted); *Atlantic Computer,* 135 B.R. at 467–68, 468 n. 7 (requiring acceptance on the part of the potential bailee, by means of explicit agreement, defies the plain language of Section 9–305 and the official comment thereto; modern authority requires only notice to the bailee); *see also Weyerhaeuser,* 872 F.Supp. at 48 (consent to a bailment by a bailee is not required under Section 9–305). This view is supported by the plain language of comment 2 to Section 9–305 which provides, in relevant part:

Where the collateral . . . is held by a bailee, the time of perfection of the security interest, under the second sentence of the section, is when the bailee receives notification of the secured party's interest: *this rule rejects the common law doctrine that it is necessary for the bailee to attorn to the secured party or acknowledge that he now holds on his behalf.*

N.Y.U.C.C. § 9–305, comment 2 (McKinney 1990) (emphasis added); *cf. New York State Energy Research and Dev. Auth. v. Nuclear Fuel Servs., Inc.,* 561 F.Supp. 954, 971 (W.D.N.Y.1983) (noting the common law principle that "the status of bailee must be voluntarily assumed and cannot be thrust upon an unconsenting person[]").

of Section 5–116(2). As the Court previously explained:

All credit involves risk. The delivery and presentment requirements of UCC Section 5–116(2) are meant to protect the assignor, assignee, and the paying bank from the type of fraud that plaintiff is alleging to have occurred in this case. Plaintiff could have lessened the risk of CHI receiving the entire payment under the letter of credit by requiring delivery of the advice of credit. Although partial assignments may preclude delivery of the actual document, given that at least two parties are entitled to the letter of credit proceeds, plaintiff and CHI could have created a bailment relationship with IDB that would have satisfied UCC Section 5–116(2)(a).

*Weyerhaeuser*, 872 F.Supp. at 47–48 (citations omitted). The plaintiff's argument that notice to the paying bank, alone, would create a bailment and perfect the purported assignment runs contrary to the statutory scheme set forth in Section 5–116(2). The plaintiff's argument would allow every purported assignee of the proceeds of a letter of credit to perfect its assignment simply by advising the paying bank of the assignment so that the paying bank thereby would become a bailee with notice. That would eliminate entirely any need for delivery of the credit to the assignee as required by Section 5–116(2)(a)—the concept of bailment would swallow up the delivery requirement and allow all of the opportunities for fraud that delivery is meant to prevent.[11]

14. Because there was no delivery of the Letter of Credit to Weyerhaeuser and because IDB was not a bailee under Article 9 of the New York Uniform Commercial Code, there was no effective or perfected assignment to Weyerhaeuser of a percentage of the proceeds of the Letter of Credit.

■ 15. There is an independent basis for the finding that Weyerhaeuser is not entitled to judgment for any of the proceeds of the Letter of Credit. IDB properly disbursed the full proceeds of the Second and Third Payments made under the Letter of Credit to CHI because CHI presented the Original Credit to IDB and requested payment of the Second and Third Payments. Under Section 5–116(2)(c), IDB acted entirely appropriately in disbursing the full amount of the proceeds to CHI, even with notice of the purported assignment to Weyerhaeuser, upon presentment of the Original Credit by CHI. Section 5–116(2)(c) thus provides an independent basis for a ruling in IDB's favor on the plaintiff's UCC claim.

16. As the Official Comment to the statute notes:

[T]he fact that letters of credit normally require presentation of drafts or demands for payment which are drawn under it and that as a result notice of assignment of proceeds can exist simultaneously with a draft payable by order or indorsement to either the beneficiary or another third person leads to the necessity for permitting an issuer to protect itself against double payment by requiring exhibition of the letter or advice of credit.

N.Y.U.C.C. § 5–116, comment 3 (McKinney Supp.1995). And, as one commentator has explained in the context of multiple assignments: "Despite a proper notification of assignment, ... the issuer can refuse to pay an assignee who did not require delivery of the letter of credit because the issuer is entitled to refuse payment until the letter or advice of credit is exhibited by the assignee seeking payment." 6C *UCC Series* § 5–116–02, at 229. Here, as explained above, Weyerhaeuser could have protected itself against payments to CHI by requiring possession of the Letter of Credit. It cannot now complain when it failed to do so and when IDB properly paid CHI pursuant to the New York Uniform Commercial Code when CHI presented the Letter of Credit and requested payment.

17. Therefore, IDB is not liable to Weyerhaeuser on Weyerhaeuser's UCC claim.

---

11. IDB has argued, persuasively, that Weyerhaeuser's interpretation would place the burden on an advising bank to inquire into the validity of every notice of assignment it receives, even where there has been no delivery of the credit to the alleged assignee and even where there is presentment of the letter of credit by the beneficiary. Section 5–116(2) allocates the burdens differently.

■ 18. To recover for tortious interference with contract, Weyerhaeuser must prove: (1) that it had a valid contract with CHI; (2) that IDB knew of the contract; (3) that IDB intentionally induced CHI to breach the contract; and (4) that Weyerhaeuser was damaged as a result of IDB's actions. *See, e.g., Universal Studios v. Nintendo Co.,* 797 F.2d 70, 75 (2d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *Riddell Sports Inc. v. Brooks,* 872 F.Supp. 73, 76 (S.D.N.Y.1995) (Leisure, J.).

19. The plaintiff has presented no credible evidence that IDB induced CHI to breach its agreement with Weyerhaeuser to assign a percentage of the proceeds of the Letter of Credit. As discussed above, IDB complied with Section 5–116(2). And, IDB complied with each set of written instructions that it received from CHI in connection with each payment—none of the instructions that CHI sent IDB in connection with the payments under the Letter of Credit either mentioned Weyerhaeuser or instructed IDB to pay a portion of the proceeds under the Letter of Credit to Weyerhaeuser. The evidence did not indicate, in any way, that IDB had any interest in seeing that CHI did not honor a contract that it had with Weyerhaeuser. Rather, the evidence demonstrates that IDB had no interest in paying the proceeds under the Letter of Credit to one entity over another. Because Weyerhaeuser has not proved, by a preponderance of the evidence, that IDB induced CHI to breach a contract with Weyerhaeuser, it cannot recover on this claim.

■ 20. To recover for prima facie tort, Weyerhaeuser must prove: (1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that otherwise would be lawful. *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990); *Maruki, Inc. v. Lefrak Fifth Ave. Corp.,* 161 A.D.2d 264, 267, 555 N.Y.S.2d 293, 296 (1st Dep't 1990). "The touchstone is 'disinterested malevolence', meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." *Twin Labs.,* 900 F.2d at 571 (citation omitted).

21. Here, as discussed in relation to the plaintiff's other claims, IDB complied fully with the requirements of Section 5–116(2) and with all written instructions from CHI concerning payment. IDB, rather than acting without excuse or justification, acted properly in disbursing payments under the Letter of Credit to CHI upon CHI's presentment of the Original Credit.[12] Moreover, there was no evidence that IDB ever intended to inflict any harm on Weyerhaeuser. It had absolutely no incentive to do so, and there is no evidence that, in carrying out CHI's instructions with respect to each payment, it acted with "disinterested malevolence." Therefore, the plaintiff has not proven its claim for prima facie tort and it cannot recover on this claim.

■ For all of the foregoing reasons, the complaint against IDB is dismissed with prejudice.[13]

12. While the plaintiff points to the Rosenwasser buck slip in support of its argument that IDB acted without excuse or justification in failing to disburse a percentage of the proceeds of the Letter of Credit to it, and argues, persuasively, that Rosenwasser was mistaken with respect to whether the proceeds of the Letter of Credit could be assigned, *see Letters of Credit* ¶ 10.04[1], at 10–23, 10–24, IDB did not act without excuse or justification in following CHI's instructions for payment in connection with the disbursement of proceeds under the Letter of Credit. Indeed, IDB acted within its statutory authority in disbursing the proceeds to the beneficiary who possessed the Credit and requested payment.

13. Because the plaintiff has not proved that IDB is liable to it on any theory, the plaintiff also is not entitled to either punitive damages or attorneys' fees.

Because the Court has concluded that IDB is not liable on any of Weyerhaeuser's claims, it is unnecessary to reach the issue of whether, if Weyerhaeuser had prevailed on any of its claims, it would have been entitled to recover 48.75 percent of the Second and Third Payments only or whether it would have been entitled to 48.75 percent of the total proceeds disbursed under the Letter of Credit. However, had it reached this issue, the Court would have concluded that Weyerhaeuser's potential recovery is limited to 48.75 percent of the Second and Third Payments only. The issue is one of contract interpretation of the Sundahl letter which constitutes the purported assignment of the proceeds of the Letter of Credit by CHI to Weyerhaeuser. The plaintiff clearly

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52(a).

**SO ORDERED.**

demonstrated what its interpretation of the Sundahl letter was, from the outset of the case until shortly before trial, by the way it chose to frame its allegations in its complaint and in the Joint Pretrial Order. In the amended complaint, the plaintiff alleged: "Upon delivery of the Irrevocable Instruction to IDB [which was received on November 9, 1991], plaintiff obtained, and now has, a perfected security interest in 48.75% of all proceeds of the Letter of Credit paid thereafter." (Amended Compl. ¶ 16.) And, the Joint Pretrial Order states, as an undisputed fact: "Weyerhaeuser's amended complaint does not seek to recover any portion of the proceeds from the First Payment and only seeks to recover 48.75 percent of the portion of the Letter of Credit paid to CHI after November 9, 1991." (JPO ¶ 28.) These statements constitute judicial admissions. *See, e.g. Albion Coop., Inc. v. Ocean Spray Cranberries, Inc.,* No. CIV–85–24E, 1987 WL 15154, *2 n. 5 (W.D.N.Y. July 27, 1987) ("Factual admissions made in a complaint are ordinarily considered binding judicial admissions.") (citation omitted); *Union Eng'g Co. v. Titan Indus. Corp.,* No. 83 Civ. 6369, 1985 WL 1979, *1 (S.D.N.Y. June 27, 1985) (Haight, J.) ("It is of course well recognized that a plaintiff is bound by the allegations made in the complaint; they are regarded as conclusive judicial admissions.") (citations omitted). While the Court permitted the plaintiff to amend its complaint immediately before trial to claim 48.75 percent of the total proceeds, the judicial admissions establish that IDB is correct that the Sundahl letter should be interpreted to have attempted to assign only 48.75 percent of the proceeds of the drawings under the Letter of Credit made after IDB received written notice of the purported assignment. Even under Weyerhaeuser's theory, only the Second and Third Payments were disbursed after IDB had received the Sundahl letter. Moreover, to the extent that Weyerhaeuser has argued that IDB wrongfully disbursed the full amount of the First Payment to IDB because of alleged oral notice of the purported assignment to IDB prior to the First Payment, (*see* Court Exh. 1), as the Court's opinion makes clear with respect to IDB's disbursement to CHI of the full amount of the Second and Third Payments, IDB is not liable to Weyerhaeuser on any theory. Therefore, Weyerhaeuser would not be entitled to any proceeds of the First Payment.