**WEIDINGER CHEVROLET, INC.,**
Appellee,

v.

**UNIVERSAL C.I.T. CREDIT CORPORATION, Appellant.**

No. 73–1681.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 12, 1974.

Decided July 31, 1974.

Rehearing and Rehearing En Banc
Denied Aug. 21, 1974.

John L. Hearne, Jefferson City, Mo., for 'appellant.

Claude T. Wood, Richland, Mo., for appellee.

Before MEHAFFY, Chief Judge, and GIBSON and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

This case presents for our review under the Uniform Commercial Code the scope and application of a security agreement granting a floor plan lender a broad security interest in the motor ve-

hicle inventory of an automobile dealer with multiple locations and sources of financing.

Jim Swanson, not a party to this litigation, was a used car dealer in Belle, Missouri. Commencing in 1964, he financed the purchase of his used car inventory through a floor plan arrangement with GMCO Agency, Inc. of Vienna, Missouri. Under the terms of the floor plan, Swanson delivered a note and title to each new car which he purchased, and GMCO issued him a check in the amount of the note. Ten per cent of the principal balance of the note was due in 90 days. Leonard Weidinger owned a one-third interest in GMCO and together with his wife owned all of the shares of Weidinger Chevrolet, Inc. Swanson had a side arrangement with Weidinger under which Swanson from time to time relieved his maturing obligations to GMCO by assigning used cars to Weidinger Chevrolet. Weidinger Chevrolet would then issue its note to GMCO in release of Swanson's note. Cars which Weidinger Chevrolet acquired in this manner were frequently left on Swanson's used car lot and were sold by him on a commission basis.

In 1968, Swanson acquired a Chrysler-Plymouth Agency at a different location. For the purpose of financing the new car agency, Swanson entered into an "Agreement for Wholesale Financing" with Universal C.I.T. Corporation (C.I.T.). C.I.T. knew that GMCO had a floor plan agreement with Swanson and did not intend to floor plan Swanson's used cars. On March 21, 1968, C.I.T. filed a financing statement executed by Swanson in favor of C.I.T. as the secured party and specifically disclosing a security interest which covered, *inter alia:*

(i) The following types of inventory, both new and used: automobiles, buses, trucks, truck tractors; trailers and semi-trailers; mobile homes, farm tractors and other farm equipment; boats, boat motors and other marine products and equipment  *  *  *; (ii) leases covering any of the foregoing; and (iii) accounts and contracts rights now or hereafter owing to the debtor.

In December, 1969, C.I.T. discovered that Swanson had sold a substantial number of new Chryslers and Plymouths "out of trust"—that is without having paid C.I.T. in accordance with the terms of the security agreement. C.I.T. promptly brought a replevin action under Missouri law asserting an immediate right to possession under its "Agreement for Wholesale Financing". C.I.T. caused all of the cars thus seized to be sold, including 22 cars which had previously been assigned to Weidinger Chevrolet. Weidinger Chevrolet thereafter brought this suit to recover the value of the cars alleged to have been converted unlawfully by C.I.T. In a trial to the court without a jury, the District Judge[1] found in favor of Weidinger Chevrolet and awarded actual damages of $34,290 and prejudgment interest of $7,200. It is from this judgment that C.I.T. appeals.

In an unpublished opinion and judgment, the District Judge intimated that by its course of dealing C.I.T. had waived its lien on the automobiles "by treating Swanson's second hand car business as completely separate from the new car business which [C.I.T.] was financing." He based his decision, however, upon the following clause which appears in the Agreement for Wholesale Financing:

You shall have all the rights of a secured party under the Uniform Commercial Code or at common law or in equity or under any other statute or under this agreement. Your rights and remedies hereunder shall be cumulative. It is agreed that new and used automobiles, trucks,  .  .  . are the subject of widely distributed standard price quotations and are customarily sold on and in a recognized

---

1. Honorable William Collinson, United States District Judge for the Eastern and Western Districts of Missouri.

market. A private sale of any chattel to a dealer in such types of chattels for the amount we originally paid for such chattel or at any lesser fair price is a commercially reasonable disposition thereof.

The District Judge construed this clause as an authorization to Swanson to make a reasonable disposition at a private sale of any of the cars secured by the agreement, free of any of its provisions. Since C.I.T. agreed that the 22 cars involved were worth far less than Weidinger Chevrolet had paid for them, the earlier sales of the cars by Swanson to Weidinger Chevrolet must have been a "commercially reasonable disposition", and Weidinger Chevrolet therefore acquired title free of C.I.T.'s security interest.

In this appeal, C.I.T. contends that it had a valid security interest in Swanson's used car inventory superior to Weidinger Chevrolet's claimed interest and that it did not waive, nor was it estopped from, asserting its interest. Further, C.I.T. contends that even if Weidinger Chevrolet acquired the cars in question from Swanson free of C.I.T.'s security interest, it resubjected the cars to the security interest by leaving the cars on Swanson's lot for resale.

Jurisdiction was based upon diversity of citizenship between C.I.T., a citizen of Delaware, and Weidinger Chevrolet, a citizen of Missouri. We apply the law of Missouri, which has adopted the Uniform Commercial Code.[2]

### Acquisition of Security Interest

The first question presented is whether C.I.T. acquired a perfected security interest in the used cars which were subsequently replevied and sold. It is undisputed that GMCO made no attempt to file or otherwise perfect its own security interest, and we are therefore not confronted with a question of priority of liens.

No attack is mounted upon the sufficiency of the security agreement[3] and financing statement. Indeed the essential elements are fully set forth. The description of the inventory in the financing statement is more than adequate notice. Nor is it significant that the automobiles were located on a Swanson used car lot rather than at the agency. It is only required that the financing statement reflect the signatures of the parties, give the address of the secured party from which information concerning the security interest may be obtained, give a mailing address of the debtor and contain a statement indicating the types, or describing the items, of collateral. V.A.M.S. § 400.9–402. Moreover, the security agreement itself refers to "All our inventory and equipment, wherever located . . . ."

■ Nothwithstanding the sufficiency of the security agreement, the District Judge found that language in the security agreement authorizing a commercially reasonable disposition of chattels constituted an express waiver by C.I.T. of its lien, provided the sale was a "commercially reasonable disposition".[4] In so holding, the District Judge read the "commercially reasonable disposition" clause entirely out of context and erroneously interpreted this provision. The clause grants to C.I.T. "all the rights of a secured party under the Uniform Commercial Code . . . ." Section 9–504(1) of the Uniform Commercial Code authorizes the sale of collater-

---

2. V.A.M.S. Chapter 400. References to sections under this Chapter correspond to article and section numbers of the Uniform Commercial Code.

3. The Agreement for Wholesale Financing provides that in event of any breach of its terms by debtor, or of any act of bankruptcy, or if C.I.T. in good faith deems the indebtedness or the chattels unsecure:

(3) You shall have a security interest in all our inventory and equipment, wherever located and whether or not financed hereunder, and you shall have the same rights with respect thereto, including removal, as you have as to chattels hereunder.

4. Quoted in text *supra* p. 462.

al, in event of default, provided the disposition is "commercially reasonable".[5] The clause upon which the District Judge relied simply provided that a private sale of a chattel to a dealer in such types of chattels for the amount originally paid by Swanson for such chattel or at a lesser fair price would be a "commercially reasonable disposition thereof". It obviously referred only to a disposition by C.I.T. in the event it exercised its right as a secured party to dispose of the collateral and thereby assured the debtor that a fair price would be obtained for the chattels used to reduce or satisfy the debt.

■ While the District Judge predicated his finding of waiver upon express language in the security agreement, he also indicated that he would be "inclined to find that by this course of dealing the defendant [C.I.T.] had waived its lien entirely by treating Swanson's second hand car business as completely separate from the new car business which defendant was financing." Since we reject the express waiver theory, we must deal briefly with the trial court's alternative comment. The court found that C.I.T. had refused to finance the used cars, was aware that they were being financed elsewhere and made no effort to determine whether Swanson was selling the used cars in the "ordinary course of business". While the Uniform Commercial Code does not preclude the application of principles of implied-in-law waiver or estoppel,[6] such findings do not support a legal conclusion based upon either theory. See V.A.M.S. § 400.9–205. The security agreement extends to automobiles, whether or not financed by C.I. T. The court made no finding, nor do we perceive anything from the record from which the court could find that Weidinger Chevrolet relied upon the course of dealing between C.I.T. and Swanson to its detriment. Nor was there any evidence of any side agreements between the parties from which waiver may be inferred.

### Sales to Weidinger Chevrolet

■ Having determined that C.I.T. acquired a valid security interest in the Swanson used cars, which was not waived by express agreement or course of conduct, we next consider the legal effect of the sales from time to time by Swanson to Weidinger Chevrolet for the purpose of reducing Swanson's legal obligation to GMCO. The security agreement authorized Swanson "to exhibit and to sell each chattel only to buyers in the ordinary course of business".[7] C.I. T. was aware of sales by Swanson to Weidinger Chevrolet. There is no evidence that these sales were at less than arm's length and no contention of fraud appears.[8] The finding of the court that

---

5. V.A.M.S. § 400.9–504 provides:
   (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .

   *   *   *   *   *

   (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. . . .

   *   *   *   *   *

6. V.A.M.S. § 400.1–102; § 400.1–103.

7. V.A.M.S. § 400.1–201(9) provides:

(9) 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

8. C.I.T.'s reliance on Commercial Credit Corp. v. Joplin Automobile Auction Co., 430 S.W.2d 440 (Mo.App.1968) is misplaced. In

the prices paid for the automobiles were fair is not clearly erroneous. From this it follows that while C.I.T. possessed a valid security interest in all of the cars, the sales by Swanson to Weidinger Chevrolet of the 22 cars at issue here was in the ordinary course of business and hence Weidinger Chevrolet acquired title free of such security interest. V. A.M.S. § 400.9–307(1).

### The Consignment

We next turn to a consideration of the consignment of the automobiles by Weidinger Chevrolet to Swanson. As previously noted, Weidinger frequently allowed cars which had been acquired from Swanson under the side arrangement to remain on the Swanson lots to be sold on commission by Swanson.[9] Section 2–326 of the Uniform Commercial Code [10] provides in part:

(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

\* \* \* \* \* \*

(b) a 'sale or return' if the goods are delivered primarily for resale.

(2) Except as provided in subsection (3), \* \* \* goods held on sale or return are subject to such claims while in the buyer's possession.

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the

goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as 'on consignment' or 'on memorandum'. However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provisions of the article on secured transactions (article 9).

In Mann v. Clark Oil & Refining Corp., 302 F.Supp. 1376 (E.D.Mo.1969), aff'd per curiam, 425 F.2d 737 (8th Cir. 1970), a trustee in bankruptcy sued defendant oil company to set aside certain preferential transfers by bankrupt to defendant. Of particular concern was the repossession of $630 worth of gasoline in bankrupt's possession under a "consignment" contract with defendant. The court held that § 2–326 was applicable and therefore the only question was whether bankrupt's business was conducted under the oil company's name or his own. Finding the business was under bankrupt's name, the court held that the gasoline was subject to the interest of general creditors. The court also held that the consignment agreement was actually a security agreement and,

---

that case an auctioneer who had handled arm's length sales in the past was held not to be a buyer in the ordinary course of business because it was only acting as an agent and also because the transfer was made to satisfy a debt to the auctioneer. Here, the transfer was in aid of liquidating a debt to a third party—GMCO, but was not "in total or partial satisfaction of a money debt" to the buyer, Weidinger Chevrolet.

9. Leonard Weidinger testified that Swanson would contact him with respect to a pro-

spective customer for one of the cars acquired by Weidinger Chevrolet; Weidinger would set a price; Swanson would call back and direct how to make out the bill of sale; and, according to Weidinger, "He would give me what I wanted, I don't know what he got from the customer." Sometimes Swanson paid GMCO the amount due on the car and settled the balance with Weidinger Chevrolet at a later time.

10. V.A.M.S. § 400.2–326.

since not perfected under the Code, was subordinated to the interest of a creditor holding a judicial lien.

■ Weidinger Chevrolet neither posted signs nor complied with the filing provisions of Article 9 of the Uniform Commercial Code. Nor did plaintiff establish that Swanson was "generally known by his creditors to be substantially engaged in selling the goods of others." Upon this record we hold that the 22 cars, although owned by Weidinger Chevrolet, were in the possession of Swanson under circumstances deemed to be a "sale or return", and hence subject to the claims of Swanson's creditors. C.I.T.'s previously perfected security interest reattached to such cars as inventory subject to such interest.[11]

### The Fuentes Defense

On this appeal, plaintiff contends that even if the court's findings and decision were erroneous, the Missouri statute under which the automobiles were seized is unconstitutional and therefore plaintiff's motion for summary judgment should have been sustained. This contention is without merit.

The Missouri replevin statute, V.A.M.S. chapter 533, is a possessory action. By following its procedure, C.I.T. was enabled to obtain possession of the automobiles without a pre-seizure hearing. Plaintiff contended in its motion for summary judgment that such seizure was in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States and in violation of Article I, Section 10 of the Missouri Constitution, V.A.M.S. *See* Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). The Missouri Supreme Court, in State ex rel. Williams v. Berrey, 492 S.W.2d 731 (Mo. 1973) (en banc), declined to hold chapter 533 facially unconstitutional. It did, however, hold that a seizure under the statute *pendente lite* must be preceded by a court hearing which will satisfy the requirements of *Fuentes*. Plaintiff cites other cases in which similar statutes have been held to be unconstitutional. McClellan v. Commercial Credit Corp., 350 F.Supp. 1013 (D.R.I.1972), aff'd sub nom., Georges v. McClellan, 409 U.S. 1120, 93 S.Ct. 935, 35 L.Ed.2d 253 (1973); Gunter v. Merchants Warren National Bank, 360 F.Supp. 1085 (D. Me.1973).

■ It would be inappropriate for us, upon this record, to pass upon the constitutionality of the Missouri replevin statute. *Fuentes* was a civil rights action in which damages were sought for breach of plaintiff's civil rights. *Berrey, supra,* was a mandamus action in which the court ordered restoration of possession because of the defective order of possession in the case below. *Fuentes* is here raised as a shield, rather than as a sword, and the defense comes too late. Had C.I.T. acquired possession of the automobiles through self-help, as they had a clear right to do under the security agreement and under the Uniform Commercial Code,[12] plaintiff could not have complained.[13]   A

---

11. *See* V.A.M.S. § 400.9–204(3). Professor Ray David Henson, discussing what is sometimes called the Mississippi River theory of inventory and accounts financing, writes:

> Within our terms of reference, 'a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement.' This is in line with the pre-Code law of many states in various areas, and raises no significant problems. It is true that a security interest cannot attach until the debtor has rights in the collateral. Once the interest attaches, however, when the collateral is inventory (as inventory would normally be understood), it very clearly

continues, although the quantity and possibly even the quality of the inventory may, as does Huck Finn's river, undergo constant change.

> R. Henson, Secured Transactions Under The Uniform Commercial Code 132 (1973). (footnotes omitted)

12. V.A.M.S. § 400.9–503.

13. Nichols v. Tower Grove Bank, 497 F.2d 404 (8th Cir., 1974); Nowlin v. Professional Auto Sales, Inc. and Mayhugh v. Bill Allen Chevrolet Co., 496 F.2d 16 (8th Cir. 1974); *see* Bichel Optical Laboratories, Inc. v. Marquette National Bank of Minneapolis, 487 F.2d 906 (8th Cir. 1973).

flaw in the means of acquisition does not impair the validity of the security interest or C.I.T.'s right to dispose of the property as permitted by the security agreement, which vested C.I.T. with all of the rights of a secured party under the Uniform Commercial Code. *See* V.A.M.S. § 400.9–205. A proper challenge to the Missouri replevin statute, on constitutional grounds, should await a more appropriate vehicle, and we decline to pass upon it here.

Judgment reversed.