## In re MORGANSEN'S LTD, Debtor.

### No. 803–80994–288.

United States Bankruptcy Court, E.D. New York.

Oct. 14, 2003.

As Corrected Oct. 14, 2003.

Ronald D. Weiss, Melville, NY, for Debtor.

## CORRECTED MEMORANDUM AND ORDER AUTHORIZING AUCTION SALE

STAN BERNSTEIN, Bankruptcy Judge.

### Background:

On February 20, 2003, Morgansen's LTD (Morgansen's or debtor) filed a voluntary petition for chapter 11 relief.[1] This case was converted to one under chapter 7 by order of this Court on August 26, 2003 and Neil Ackerman, Esq. (trustee) was appointed on the same date. During various evidentiary hearings, frequently held on the non-residential real property lessor's motions, and or at status conferences held on the record, the debtor testified that it was engaged in the business of selling various expensive items such as jewelry, art, collectibles and furniture in a shop in Southampton to retail customers, other dealers, and interior decorators; the debtor also conducted auction sales of its inventory from time to time.

The debtor found this to be a cyclical business. The shop was open 5–7 days a week during the summer and two or three days a week the rest of the year. The debtor obtained these goods through direct purchases from liquidating estates in the area but estimated that 70% of the items were obtained by consignment. The goods obtained by direct purchase and by consignment were commingled in the shop; many of the goods were on display in cases. The majority of customers walking into the shop, or attending an auction sale sponsored by Morgansen's, would not know whether a particular item was consigned by a third party or had been previously purchased by the debtor for resale on its own account. The debtor further testified at those same hearings or status conferences that she had a core base of customers who were interior decorators. She would sell directly to the interior decorators who would, in turn, resell the items in their jobs.

A hearing on 12 day's expedited notice concerning a proposed auction sale was requested by the trustee on September 17, 2003.[2] The hearing was held on October 1, 2003. Objections to the sale were filed. During the hearing, the Court listened to arguments and representations from the trustee and the testimony of the proposed auctioneer, David R. Maltz, in support of the auction. The primary thrust of the trustee's representations and the auctioneer's testimony was that it would be prohibitively costly to wrap, load into moving trucks, unload, unwrap, and set up the goods in lots from their present location to the auctioneer's warehouse in Plainview, New York. There was a great risk that in this process substantial breakage of fragile goods, like chandeliers and other art objects of glass or similar materials, would occur. The auctioneer further testified that the sale should be conducted at the existing location on two different dates, given the crowding of the goods in the storage areas of the debtor's premises, and that the sales should be conducted as early as possible before the onset of adverse weather conditions. The trustee stressed that the estate was obligated to incur about $10,000 in monthly costs for rent, utilities, and insurance, and that he had no assurance that those costs would not mate-

---

1. This Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the General Reference to the Court under Rule 4 of the General Rules of the United States District Court for the Eastern District of New York. This is a core proceeding under 28 U.S.C. § 157(b)(2). This Memorandum and Order constitutes Findings of Fact and Conclusions of Law under Fed.R.Civ.P. 52 as made applicable by Fed. R. Bankr.P. 7052.

2. The Order granting the hearing was signed on September 19, 2003.

rially increase. On a cost-benefit basis, the trustee exercised his business judgment in favor of a properly advertised auction at the premises of all items that were in the debtor's possession.

The Court also heard the representations and arguments of several alleged consignors in opposition to the auctioning of "their consigned goods." Some of the parties asked for additional time to brief the issues. The Court allowed them to file memoranda by October 10, 2003 and ordered the hearing to be continued until October 14, 2003 for further oral argument, if deemed necessary on the part of the Court. Three memoranda were filed on October 10, 2003. Now that the Court has deliberated upon the representations and arguments, the original pleadings and memoranda and the supplemental memoranda, it has determined to approve the trustee's motion and has further determined to deny the request of the consignors who participated in the hearings to have the trustee or his auctioneer set aside any of the consigned goods for further disposition.

### Discussion

The law of consignments is governed by the Uniform Commercial Code (UCC), especially sections UCC 9–102(a)(20) and next UCC 2–326, as amended by the State of New York, effective July 1, 2002.[3] The standard approach is first to go to section 9–102(a)(20), and if the transaction does not fit under this section, then to go next to section 2–326; if the transaction does not fit under section 2–236, then the transaction falls entirely outside the Uniform Commercial Code, and the Court must then fall back on the common law of bailments and other traditional practices.

**3.** UCC Section 1–102(1)(b) states that "This Act shall be liberally construed and applied to promote its underlying purposes and policies. . . . to permit the continued expansion of commercial practices through custom, usage and agreement of the parties."

**4.** "The purpose of former U.C.C. § 2–326(3) and now revised U.C.C. §§ 9–102(a)(20) & 9–

### § 9–102. Definitions And Index of Definitions

(a) Article 9 definitions. In this article:
(20) "Consignment" means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
(A) the merchant:
  (i) deals in goods of that kind under a name other than the name of the person making delivery;
  (ii) is not an auctioneer; and
  (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others;
(B) with respect to each delivery, the aggregate value of the goods is $ 1,000 or more at the time of delivery;
(C) the goods are not consumer goods immediately before delivery; and
(D) the transaction does not create a security interest that secures an obligation.

■ UCC Section 9–102(a)(20) was added by the July 2001 amendments to the New York UCC. This definition is completely new.[4] In order for a transaction to fit under this section, each of the attributes of a consignment as defined in section 9–102(a)(20) must be satisfied. There are disputed facts whether each of these attributes has been satisfied in this case, and the burden of proof with respect to each attribute falls on the party claiming to be protected by this section. Under (A)(i), the debtor is indisputably a merchant who deals in goods delivered to it for the purpose of sale, and the debtor operates under a trade-name other than the names of the "consignors."

319(a) is to protect general creditors of the consignee from claims of consignors that have undisclosed consignment arrangements with the consignee that create secret liens on the inventory." *In re Valley Media, Inc.*, 279 B.R. 105, 121 (Bankr.D.Del.2002) (*citing cases*).

With respect to (A)(ii), the consignors who opposed the auction represented that the debtor was, in fact, an auctioneer by virtue of its holding several auctions a year, especially during the summer months, at its leased premises in the Hamptons. The operative question is whether a merchant who sells to retail customers, interior decorators, or other dealers items of art, collectibles, and antique furniture on display or at its warehouse and who also sells both its own inventory and consigned inventory by occasional auctions falls outside or inside this section. What cannot be disputed is that the debtor did sell its own goods and some of the consigned goods in non-auction transactions with retail customers, interior decorators, and other dealers. It is surely the case that the debtor did not exclusively act as an auctioneer. Does the merchant have to sell a majority in value of its own and the consigned goods by auction within, say, a one year period to be excluded from the scope of this section? Or is any percentage of actual sales of a material amount by auction, say, greater than 30% of its total revenue within the same one year period sufficient to exclude these transactions from Article 9? None of the memoranda of law submitted by the opposing consignors cited any authority on this point, and, therefore, their objection falls on this ground alone. For example, in *Quaker City Iron Works, Inc. v Ganz (In re Wicaco Mach. Corp.)*, 49 B.R. 340, 344 (E.D.Pa.1984), the court held that one-fifth of creditors knowing of consignment relationship did not satisfy the "general knowledge requirement," despite the fact that those creditors represented 63% of claims against debtor. *In re BRI Corp.*, 88 B.R. 71, 74–75 (Bankr.E.D.Pa.1988) (consignor must show that "most" of consignee's creditors knew of consignment practice).

■ Under section (A)(iii), none of the objecting consignors put on any proof that the debtor was "not generally known by its creditors to be substantially engaged in selling the goods of others." The fact that there may have been a sign on the exterior of the leased premises indicating that the merchant was also an auctioneer is not sufficiently probative. The debtor has significant unsecured claims from utility companies and other third party suppliers of goods and services that may not know exactly what kind of business is conducted on the premises. The personal knowledge of a few protesting consignors does not satisfy their burden of proof of what subjectively the other creditors generally knew or should have known about the exact nature of the debtor's business activities. The Court does not have to go any further in its analysis to determine whether the other attributes of a consignment for purposes of Article 9 are proven.

The analysis then proceeds to section 2–326 under the UCC as amended and as enacted by New York, effective July 1, 2001.

§ *2–326. Sale on Approval and Sale or Return; Rights of Creditors*

(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

(a) a "sale on approval" if the goods are delivered primarily for use, and

(b) a "sale or return" if the goods are delivered primarily for resale.

(2) Goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

(3) Any "or return" term of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this Article (Section 2–201) and as contradicting the sale aspect of the contract within the provisions of this Article on parol or extrinsic evidence (Section 2–202).

The crux of the problem concerns the 2001 change in UCC 2–326.[5] The Com-

5. That subsection used to provide that Section 2–326 would not be applicable, and consigned goods turned over to a debtor for sale would not be subject to the claims of the debtor's creditors.

ment to the 2001 amendments stated that "certain true consignment transactions were dealt with in former Sections 2–326(3) and 9–114. These provisions have been deleted and have been replaced by new provisions in Article 9." This subsection worked to protect the consignors of the debtor and prevent consigned goods from being sold by the debtor's trustee in a chapter 7 case. Under former section 2–326, the burden of proof was on the consignor to show that a debtor was "generally known by its creditors to be substantially engaged in the sale of goods of others" and therefore it was not necessary for the creditor to file a financing statement. The 2001 amendments to section 2–326 do not contain this language.

In this case, the goods consigned to the debtor clearly were delivered on a "sale or return" basis. The Comments to the 2001 Amendments state that

> "A sale or return is a present sale of goods which may be undone at the buyer's option." Accordingly, subsection (2) provides that goods delivered on approval are not subject to the prospective buyer's creditors until acceptance, and goods delivered in a sale or return are subject to the buyer's creditors while in the buyer's possession. These two transactions are so strongly delineated in practice and in general understanding that every presumption runs against a delivery to a consumer being a "sale or return" and against a delivery to a merchant for resale being a "sale on approval."

■ Based upon the language of the very "consignment agreements" themselves, the intention of the parties to these transactions is beyond reasonable dispute. The debtor was authorized to sell them by private sales or, in its discretion, by auctions. Its only written obligation was to pay to the "consignors" the net proceeds of sale, less its commission. If the consignor

materially breached this provision of the agreement, then presumably the "consignors" had a right under the common law in New York State to sue for damages. Under UCC Section 2–326 as amended, goods which are consigned for sale, are property of the bankruptcy estate of the "consignee," and subject to the claims of the creditors of the entity doing the sale (Morgansen's). If a person takes goods to one who is considered a consignee (a "buyer" for resale) and that buyer files for bankruptcy relief, the buyer/debtor's trustee will take the goods as property of the debtor's estate. Under section 544(a) of the Bankruptcy Code, these goods may be sold by debtor's trustee. *See Furr v. Corvette Experience, Inc. (In re Corvette Collection of Boston, Inc.),* 294 B.R. 409, 413 (Bankr. S.D.Fla.2003) (construing Florida Stat. § 672.326, which adopts Article 2 of the UCC). Under the UCC section which was in effect prior to July 1, 2001, the court held that a consignor who failed to perfect a security interest in goods consigned could not recover as a secured creditor from an assignee for benefit of creditors. "Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return" and subject to claims of that person's creditors. *In re Toys Galore, Inc.,* 108 Misc.2d 200, 437 N.Y.S.2d 227, 228–229 (1981) (quoting former UCC section 2–326(3)).

■ The consignors were under constructive notice of the provisions of the UCC that subordinated their rights to the return of any of their goods to the superseding claims of the creditors of the buyer, the debtor. This may strike the consignors as grossly unfair, but that is the balance that the State of New York

reached among competing parties in interest. The law is painfully clear—anybody who delivers goods with a "right of return" to a merchant who sells them under its own name is at risk that the merchant may file for bankruptcy relief, and the trustee will liquidate the goods for the benefit of the creditors. Any right of return under a consignment agreement or a transaction in which goods are delivered for sale or return is effectively abrogated by state law upon the consignee's or merchant's filing for bankruptcy relief. It may come as little consolation to the consignors, but their only recourse is to petition Governor Pataki and the New York Assembly for relief from their grievances.

The form contract[6] that the debtor entered into with its consignors clearly indicated what was being created was a consignment agreement. In fact, the first line reads "CONSIGMENT AGREEMENT BETWEEN MORGANSEN'S LTD ('MORGANSENS') AND [blank] FOR AND ON BEHALF OF (CONSIGNOR)". Other language reads "Thank you for consigning your property to Morgansen's. The terms and conditions of the consignment are as follows: CONSIGNMENT; You 'Consignor' hereby consign to Morgansen's the property . . . which Morgansen's as the exclusive agent for Consignor, will offer for sale at, but not limited to public auction." In addition, Morgansen's stated that it would have "complete discretion as to (1) the place and date of sale and the manner in which such sale is conducted . . ."[7]

Although the analysis is complete with section 2–326, some of the protesting "consignors" have argued that their transactions should be treated as bailments. There is no definition of the word "bailment" in Section 9–102 of the UCC. Courts must look to state law to determine the definition. *In re Atlantic Computer Systems, Inc.,* 135 B.R. 463, 466 (Bankr. S.D.N.Y.1992). The court in *SEC v. Credit Bancorp, Ltd.,* 2000 WL 1752979, *25, 2000 U.S. Dist. LEXIS 17171, *81–82 (S.D.N.Y. 2000), stated that a "bailment is a delivery of personal property for some particular purpose . . . upon a contract, express or implied, *that after the purpose has been fulfilled it shall be redelivered to the person who delivered it . . .*" (*quoting In re Veon, Inc.,* 12 B.R. 186, 189 (Bankr.W.D.Pa.1981))(emphasis added); *Weyerhaeuser Co. v. Israel Discount Bank,* 895 F.Supp. 636, 647 (S.D.N.Y. 1995); *Rich v. Touche Ross & Co.,* 415 F.Supp. 95, 99 (S.D.N.Y.1976). The relationship between Morgansen's and the consignors was clearly not a bailment.

### Conclusion

Based upon this discussion, the trustee's motion to hold an auction sale is granted and the objections to the sale are overruled.

SO ORDERED.[8]

---

6. At times in the contract, Morgansen's refers to itself as an "agent." Blacks Law Dictionary (6th Ed.) defines an agent as "a person authorized by another (principal) to act for or in the place of him; one entrusted with another's business . . . One who undertakes to transact some business, or to manage some affair, for another . . ." A true consignment would work to create a principal/ agent relationship. The debtor did "undertake to transact some business" for the consignors, namely, selling their items for them.

7. Morgansen's Consignment Agreement, Paragraph 6, "Sale Arrangements."

8. This opinion is intended to supercede in all respects the Memorandun of Decision issued on October 14, 2003.