EXCEL BANK, Appellant,

v.

NATIONAL BANK OF KANSAS CITY,
d/b/a Great American Acceptance
Company, Respondent.

No. WD 69701.

Missouri Court of Appeals,
Western District.

June 30, 2009.

James A. Hanson, for Appellant.

Cassandra L. Writz, for Respondent.

Before Division Three: JAMES M. SMART, Presiding Judge, JOSEPH M. ELLIS, Judge and JAMES E. WELSH, Judge.

JOSEPH M. ELLIS, *Judge.*

Excel Bank ("Excel") appeals from a summary judgment in favor of National Bank of Kansas City d/b/a Great American Acceptance Company ("GAAC") on Excel's replevin action concerning eighteen vehicles that GAAC seized from a used car dealer, Miles Truck and Auto ("Miles"). For the following reasons, we affirm.

■ The underlying facts are undisputed. On March 5, 2004, GAAC advanced money to Miles under a floor plan financing arrangement.[1] Miles granted GAAC a security interest in, among other things, all inventory that Miles "own[s] or ha[s] sufficient rights in which to transfer an interest, now or in the future ... and all proceeds and products" therefrom. Inventory was defined as "[a]ll inventory which [Miles] hold[s] for sale, lease, rental or demonstration and/or which [GAAC] ha[s] financed." GAAC filed a financing statement with the Missouri Secretary of State a few days later, identifying Miles as the debtor and describing the property in which it had a security interest.

Miles defaulted on the financing agreement, and on January 12, 2008, GAAC seized certain vehicles from Miles's place of business. Shortly thereafter, Excel contacted GAAC, claiming an interest in eighteen of the seized vehicles and demanding their return. As evidence of its interest, Excel relied on a September 13, 2007 letter agreement with Miles stating:

> All remaining inventory for Eastland Auto Plaza, L.L.C. has been delivered to Miles Truck and Auto, 23110 E 40 HWY, Blue Springs, MO 64015. Miles has agreed to sell remaining inventory, receiving the amount of $400.00 per vehicle. This amount will cover sales commissions, advertisements, and any other cost incurred to sell the vehicles with the exception of repairs. Miles must call Excel Bank with all bids before any repairs are made. It will be the banks [*sic*] call whether or not to fix the vehi-

---

1. "Floor plan financing is a method of financing where a lender provides money for the purpose of allowing a dealer of goods to buy inventory that is later resold to the consum-er." *Citizens Nat'l Bank v. Maries County Bank,* 244 S.W.3d 266, 269 (Mo.App. S.D. 2008).

cles. The bank will reimburse Miles for any repairs requested by the bank as long as he supplies invoices for all work done. Miles will call the bank concerning all bids to sell the vehicles and the bank will decide whether or not to take what is offered.

Excel further relied on the fact that it retained possession of the original certificates of title for the eighteen vehicles, which reflected Excel as the owner. Excel had not filed a financing statement with the Missouri Secretary of State concerning the disputed vehicles, it had not notified GAAC of any claimed interest prior to delivering the vehicles to Miles, and none of the vehicles were identified on Miles's lot as being subject to any claim or interest by Excel. GAAC refused to return the disputed vehicles.

On January 22, 2008, Excel filed a petition for replevin against GAAC in the Circuit Court of Jackson County. GAAC responded with an answer and a motion for summary judgment. Excel opposed the motion and filed its own motion for summary judgment. After a hearing, the court sustained GAAC's motion and denied Excel's motion, issuing its findings of fact, conclusions of law, and judgment on May 22, 2008. The court concluded that the relationship between Excel and Miles concerning the disputed vehicles was a consignment subject to the perfection requirements of the Uniform Commercial Code ("UCC"), that possession of the certificates of title in Excel's name was insufficient to perfect Excel's interest, and that Excel had an unperfected purchase money security interest. The court further concluded that GAAC had a validly perfected security interest in Miles's entire inventory, that GAAC's interest was superior to Excel's interest, and that GAAC was entitled to retain possession of the disputed vehicles. This appeal follows.

■■■ "Appellate review of the grant of summary judgment is de novo." *Midwestern Health Mgmt., Inc. v. Walker*, 208 S.W.3d 295, 297 (Mo.App. W.D.2006). "The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record." *Lewis v. Biegel*, 204 S.W.3d 354, 356 (Mo.App. W.D.2006) (internal quotation omitted). "Summary judgment is appropriate only when the record demonstrates that there are no genuine disputes regarding material facts and that the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation omitted). Where "the points on appeal do not indicate a factual dispute, but instead center on whether the [movant] was entitled to judgment as a matter of law ... the propriety of summary judgment is purely an issue of law and no deference is afforded to the circuit court's judgment." *Christian County v. Edward D. Jones & Co.*, 200 S.W.3d 524, 527 (Mo. banc 2006).

In its sole point of error, Excel asserts that the circuit court erred in granting summary judgment in favor of GAAC because the court erroneously concluded that the relationship between Excel and Miles concerning the disputed vehicles was a consignment subject to the requirements of the UCC instead of a simple bailment to which GAAC's security interest did not attach. Excel concedes that, if the circuit court correctly concluded that the relationship was a consignment, then GAAC had a superior security interest in the disputed vehicles and was entitled to seize them.

■■■ The UCC is intended " '(a) to simplify, clarify and modernize the law governing commercial transactions;' and '(c) to make uniform law among the various jurisdictions.' " *Dean Mach. Co. v. Union Bank*, 106 S.W.3d 510, 517 (Mo.

App. W.D.2003) (quoting § *400.1–102(2)* ). Because there is very little Missouri case law concerning consignments under the UCC, we look to decisions from other jurisdictions for guidance.[2] *Id.* In addition, "Official Comments to uniform laws adopted by the legislature, though not controlling, are a persuasive aid in determining legislative intent." *Mamoulian v. St. Louis Univ.*, 732 S.W.2d 512, 516 n. 10 (Mo. banc 1987).

■■ "A 'bailment' in its ordinary legal sense signifies a contract resulting from the delivery of a thing by the bailor to the bailee with the condition that it be restored to the bailor in accordance with his directions as soon as the purpose for which it was bailed is satisfied." *K.C. Landsmen, L.L.C. v. Lowe–Guido*, 35 S.W.3d 917, 922 (Mo.App. W.D.2001). "A consignment is a type of bailment where the goods are entrusted for sale." *Eagle Boats, Ltd. v. Cont'l Ins. Co. Marine Office of Am., Corp.*, 968 S.W.2d 734, 737 (Mo.App. E.D. 1998).

The UCC was substantially revised effective July 1, 2001. Under both the prior and current versions, § 2–326 provides that, "[u]nless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is . . . a 'sale or return' if the goods are delivered primarily for resale." Goods held on "sale or return" are subject to the claims of the buyer's creditors while in the buyer's possession. *§ 2–326(2)*. Prior to July 1, 2001, § 2–326(3) provided:

> Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery
>
> (a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or
>
> (b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or
>
> (c) complies with the filing provisions of the Article on secured transactions (Article 9). . . .

*§ 2–326(3)* (2000). Section 9–114 then provided that "[a] person who delivers goods under a consignment which is not a security interest and would be required to file under [Article 9] by paragraph (3)(c) of Section [ ]2–326 has priority over a secured party who is or becomes a creditor of the consignee and who would have a perfected security interest in the goods if they were the property of the consignee" if the consignor complies with specified notice requirements.

" '[C]ertain true consignment transactions were dealt with in the former Sections 2–326(3) and 9–114,' " but those provisions were deleted effective July 1, 2001, and were replaced by §§ 9–109(a)(4), 9–

---

**2.** The UCC is codified in Missouri in Chapter 400, RSMo Cum.Supp.2007 and RSMo 2000. For ease of reference and comparison to other states that have adopted the UCC, we will cite relevant sections of Articles 2 and 9 by their uniform citations, which correspond to the sections in Chapter 400. For example, § 2–326 corresponds to § 400.2–326, RSMo, and § 9–319 corresponds to § 400.9–319, RSMo.

103(d) and 9–319. *In re Haley & Steele, Inc.*, No. 90937, 2005 WL 3489869, at *4, 2005 Mass.Super. LEXIS 540, at *10 (Mass.Super.Ct. Nov. 14, 2005) (quoting *UCC § 2–326 cmt. 4*). As a result, § 2–326 no longer applies to consignments. "If a transaction is a 'sale or return,' as defined in revised Section 2–326, it is not a 'consignment.' In a 'sale or return' transaction, the buyer becomes the owner of the goods, and the seller may obtain an enforceable security interest in the goods only by satisfying the requirements of Section 9–203." *UCC § 9–109 cmt. 6; see also In re Haley & Steele, Inc.*, 2005 WL 3489869, at *3–4, 2005 Mass.Super. LEXIS 540, at *9–10 (A "sale or return" requires a "present sale," where a "sale" is defined as "the passing of title from the seller to the buyer for a price," § 2–106(1), and that "is not what happens when goods pass from a consignor to a consignee.").

Under the current version of the UCC, Article 9 applies to every "consignment" as defined in § 9–102. *See* § 9–109(a)(4); *Goss v. Morgansen's Ltd.*, No. 04–CV–0268 (ADS), 2005 WL 2370856, at *6–7, 2005 U.S. Dist. LEXIS 43600, at *18–19 (E.D.N.Y. Sept. 27, 2005) (Former § 2–326 governed "true" consignments and Article 9 governed consignments intended as security interests, but § 2–326 was amended in 2001 "so that transactions involving consignments would generally be covered by Article 9."). A consignment is defined as:

a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:

(A) The merchant:

(i) Deals in goods of that kind under a name other than the name of the person making delivery;

(ii) Is not an auctioneer; and

(iii) Is not generally known by its creditors to be substantially engaged in selling the goods of others;

(B) With respect to each delivery, the aggregate value of the goods is one thousand dollars or more at the time of delivery;

(C) The goods are not consumer goods immediately before delivery; and

(D) The transaction does not create a security interest that secures an obligation[.]

*UCC § 9–102(a)(20)*. This definition "includes many but not all 'true' consignments (i.e., bailments for the purpose of sale)." *UCC § 9–109 cmt. 6.* Subparagraphs (B) and (C) exclude "transactions for which filing would be inappropriate or of insufficient benefit to justify the costs." *UCC § 9–102 cmt. 14.* In addition, "consignments intended for security" are excluded from the definition of "consignment" because they "are not bailments but secured transactions" and are subject to all of the provisions of Article 9. *Id.*

"Once the transaction is determined to fall within the revised UCC §§ 9–102(a)(20) definition of consignment, then revised UCC § 9–319(a) applies when a creditor of the consignee seeks to recover against the consigned goods." *In re Valley Media, Inc.*, 279 B.R. 105, 123 n. 30 (Bankr.D.Del.2002); *see also United States v. Nektalov*, 440 F.Supp.2d 287, 298 (S.D.N.Y.2006). Section 9–319(a) provides that, "for purposes of determining the rights of creditors of ... a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had." "Insofar as creditors of the consignee are concerned, [Article 9] to a considerable extent reformulates the former law, which appeared in former Sections 2–326 and 9–114, without changing the results." *UCC § 9–319 cmt. 2.*

Section 9–103(d) provides that "[t]he security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory." Accordingly, the perfection and priority rules concerning competing security interests apply to consigned goods. *UCC § 9–109 cmt. 6.* With certain exceptions, a financing statement must be filed to perfect all security interests. *§ 9–310(a).* In general, a financing statement need not be filed to perfect a security interest in a motor vehicle because it may be perfected by complying with §§ 301.600 to 301.660, RSMo, which concern motor vehicle liens and registration. *§ 9–310(b)(3); § 9–311(a)(2).* However, this exception to the filing requirement does not apply to security interests created by a dealer of motor vehicles who holds the vehicles for sale. *§ 301.650.1(3); § 9–311(d).* In the case at bar, it is undisputed that GAAC had a validly perfected security interest in Miles's after-acquired inventory and that Excel did not take the required steps to perfect any interest it may have had under the UCC. "A perfected security interest ... has priority over a conflicting unperfected security interest ...." *§ 9–322(a)(2).*

The Article 9 definition of a consignment is very similar to the definition under former *§ 2–326(3).* Both sections require that (1) the goods be delivered to a person for sale where that person maintains a place of business at which he deals in goods of the kind involved under a name other than the name of the person making delivery and (2) the person conducting the business is not generally known by his creditors to be substantially engaged in selling the goods of others. In the case at bar, Excel argues that its relationship with Miles concerning the disputed vehicles was not a consignment because Miles was not holding the vehicles "for sale." It contends that the relationship was more like a "parking garage" than a consignment because Excel retained the certificates of title, which listed Excel as the owner, and Miles did not have authority to transfer title without Excel's approval but was only procuring offers for purchase.

Excel relies on several cases interpreting former § 2–326(3) where the courts stated the general definition of a consignment and/or held that a consignment existed where there was no evidence of restrictions on the dealer's authority to transfer property to a buyer.[3] However, none of these cases stands for the proposition that a dealer must have unrestricted authority to transfer title for a consignment to exist. Excel further relies on several bankruptcy cases involving competing claims to grain deposited in a grain elevator,[4] but farm products are subject to special rules under

---

**3.** *See Globe Sec. Co. v. Gardner Motor Co.,* 337 Mo. 177, 85 S.W.2d 561, 567 (1935) (pre-UCC case stating that "[t]he consignee is under no obligation to pay a price, but is clothed with the possession of the property and the authority to sell"); *Temple v. McCaughen & Burr, Inc.,* 839 S.W.2d 322, 326 (Mo.App. E.D.1992) (consignment was sufficiently pled where the bailor delivered property to the dealer/bailee on the condition that the dealer "attempt to sell" the property and either return the property to the bailor or pay the bailor a set price depending on whether the property sold); *Eagle Boats, Ltd. v. Cont'l Ins. Co. Marine Office of Am., Corp.,* 968 S.W.2d 734, 737 (Mo.App. E.D.1998) (general definition); *In re Easton Tire Co.,* 35 B.R. 494, 494–95 (Bankr.E.D.Mo.1983) (consignment existed where the dealer had "full and complete access" to the bailor's property and could "sell or dispose of the entire chain inventory at any one time").

**4.** *See In re Childress,* 182 B.R. 545, 554–55 (Bankr.W.D.Mo.1995); *In re Woods Farmers Coop. Elevator Co.,* 107 B.R. 678, 683 (Bankr. D.N.D.1989); *First Bank of N.D. (N.A.)–Jamestown v. Pillsbury Co.,* 801 F.2d 1036, 1037–40 (8th Cir.1986).

both the UCC and the Bankruptcy Code, so those cases are inapplicable to the facts at hand.

"At common law, consignors often prevailed over creditors who had extended credit to a consignee based on the consignee's apparent ownership of consigned goods. Consignors prevailed because they still held title in the goods; a consignee's creditors were therefore viewed as unable to take any interest through the consignee." *In re State Street Auto Sales, Inc.,* 81 B.R. 215, 218 (Bankr.D.Mass.1988).

"The purpose of former UCC § 2–326(3) and now revised UCC §§ 9–102(a)(20) & 9–319(a) is to protect general creditors of the consignee from claims of consignors that have undisclosed consignment arrangements with the consignee that create secret liens on the inventory." *In re Valley Media, Inc.,* 279 B.R. at 125; *see also In re Morgansen's Ltd.,* 302 B.R. 784, 787 n. 4 (Bankr.E.D.N.Y.2003); *In re Georgetown Steel Co., LLC,* No. 03–13156–W, 2004 Bankr.LEXIS 2393, at *32 (Bankr. D.S.C. Dec. 3, 2004).

> "The basis for this hostility to consignment arrangements . . . is fairly obvious. Regardless of the legal theory of the consignment, in practical operation it looks like a sales transaction in which the unpaid seller retains a secret lien in his goods. *From a creditor's point of view, the consigned goods appear to be part of the regular inventory of the consignee which, therefore, ought to be subject to their claims.* What is more, . . . there is no public filing or other notoriety respecting the consignment to warn the creditors that the consignor may have rights in the goods which are superior to theirs."

*Goss,* 2005 WL 2370856, at *6, 2005 U.S. Dist. LEXIS 43600, at *16 (quoting *In re Truck Accessories Distributing, Inc.,* 238 B.R. 444, 448 (Bankr.E.D.Ark.1999)).

"The policy of the UCC would be undermined if an owner could show by proof of undisclosed mental operations that the transaction was something other than a consignment." *ITT Commercial Fin. Corp. v. Unlimited Auto., Inc.,* 166 B.R. 637, 644 (N.D.Ill.1994); *see also Bischoff v. Thomasson,* 400 So.2d 359, 367 (Ala.1981). The primary difference after the 2001 revisions is that consignors may no longer rely on notice through the posting of signs and/or written notification to other creditors, *see* former §§ 2–326(3) & 9–114, and they must now file a financing statement to protect their interests, *see* §§ 9–103(d), 9–310, & 9–311.

Many courts have described the concept of a "true" consignment, as opposed to a sale or a consignment intended as a security interest, both before and after the 2001 revisions to the UCC. "A consignment of goods for sale does not pass the title at any time, nor does it contemplate that it should be passed . . . . In effect, a consignment is a special kind of agency involving the delivery of goods to one . . . for the purpose of finding a buyer." *Bischoff,* 400 So.2d at 364 (internal quotations omitted). A consignment "exists where one party . . . transfers possession of goods to another . . . who in turn resells the goods to third-party consumers," where "[t]itle and the right to immediate possession of the goods remains with the consignor" until the consignee exercises its option to take title once certain conditions are met. *Nektalov,* 440 F.Supp.2d at 298; *see also Cherry–Air, Inc. v. OK Turbines, Inc.,* No. 00–42141–BJH–11, 2001 Bankr.LEXIS 2243, at *11 (Bankr.N.D.Tex. Apr. 17, 2001) (" '[A] true consignment is one in which the consignor retains extensive control over the goods but gives up possession with the intent that they be sold to a third party and in which the consignee may return the goods at any time and is not

obligated to pay a fixed price for them.'" (quoting *3A Ronald A. Anderson, Anderson on the Uniform Commercial Code* § 2–326:48 (3d ed.1995)).

"[T]he UCC looks to the outwardly visible aspects of a transaction in determining whether an arrangement for the sale of goods is a consignment." *ITT Commercial Fin. Corp.*, 166 B.R. at 644; *see also Bischoff*, 400 So.2d at 367. The term "for sale" in the UCC definition of consignment "refers to a transaction's ultimate purpose and not ... to the question of whether the person to whom the goods were entrusted had the independent authority to sell them." *Berk v. State Bank of India*, No. 96 CIV. 4972(MBM), 1998 WL 567853, at *4, 1998 U.S. Dist. LEXIS 13696, at *11 (S.D.N.Y. Aug. 28, 1998). This is consistent with the principle that former § 2–326(3), and now §§ 9–102(a)(20) and 9–319(a), were "designed to allow creditors to make lending decisions on the basis of externally visible information, without having to investigate undisclosed side agreements that may seek to structure a transaction as something other than a [consignment]." *Id.* 1998 WL 567853, at *4, at *11–12.

Factors indicating that the parties intended a "true" consignment include that the consignor retains control over the sale price, the consignee is given possession with authority to sell only upon consent of the consignor, the consignor may recall the goods at any time, and the consignee is to receive a commission instead of a profit from the sale. *In re Oriental Rug Warehouse Club*, 205 B.R. 407, 410 (Bankr. D.Minn.1997); *see also Nektalov*, 440 F.Supp.2d at 299 ("[A] 'true consignment' is characterized by the fact that the consignor retains ownership and sets the sale

price; the consignee receives a commission and not the profits of the sale." (internal quotation omitted)). All of these factors are present in the case at bar. Miles was to attempt to "sell remaining inventory," he would receive $400 commission for each vehicle for whom he found a buyer willing to purchase a vehicle at a price approved by Excel, and he was not obligated to pay for any of the vehicles for which he did not find a buyer. This is very similar to the situation that was found to be a consignment under former § 2–326(3) in *Weidinger Chevrolet, Inc. v. Universal C.I.T. Credit Corp.*, 501 F.2d 459, 464–65 (8th Cir. 1974). The fact that Excel retained title and extensive control over the disputed vehicles does not prevent the transaction from being a consignment subject to the perfection requirements of the UCC. *See Bischoff*, 400 So.2d at 364; *Nektalov*, 440 F.Supp.2d at 298; *Cherry–Air, Inc.*, 2001 Bankr.LEXIS 2243, at *11. Although Miles was not given full authority to sell the vehicles to whomever he chose for any price, the vehicles were clearly entrusted to him for the ultimate purpose of sale. *See Berk*, 1998 WL 567853, at*4, 1998 U.S. Dist. LEXIS 13696, *11–12.

Excel further argues that, although it did not file a UCC financing statement concerning the disputed vehicles, GAAC had a duty to conduct due diligence by examining the public motor vehicle registration records to determine whether any other entity asserted an interest in the vehicles. Excel mistakenly relies on a pre–UCC case, *Held v. Reis*, 193 S.W.2d 17 (Mo.1946), involving completely different facts. The present version of the UCC equates due diligence in this fact pattern with checking for perfected security interests.[5]

---

**5.** In *Automotive Finance Corp. v. Cornejo*, No. D044553, 2005 WL 1349904, 2005 Cal.App. Unpub. LEXIS 5011 (Cal.App. June 8, 2005),

a California court held that a creditor made a sufficient showing of due diligence in determining whether vehicles were subject to its

In revising the UCC in 2001, the drafters of the UCC, and by extension the Missouri legislature, chose to remove the additional provisions that allowed consignors to protect their interests through actual or constructive notice and, instead, required them to file a UCC financing statement to protect their interests. *See former §§ 2–326(3) & 9–114; revised §§ 9–102(a)(20), 9–319(a), 9–103(d), 9–310, & 9–311.* Both Excel and GAAC are sophisticated parties with access to expert advice on the requirements of the UCC. Excel could easily have filed a financing statement to protect its interest in the vehicles, but it took no steps whatsoever to inform third parties that it retained any interest in the vehicles, other than retaining the certificates of title in its possession. Although GAAC could have checked the motor vehicle registry in addition to the UCC filings, it was not required to do so. Point denied.

The trial court's judgment is affirmed.

All concur.

security interests under a similar factual pattern to the case at bar. *Id.* at *6, 2005 Cal. App. Unpub. LEXIS 5011, at *16–17. In *Cornejo*, the creditor didn't check with Department of Motor Vehicles regarding title to the consigned vehicles, but it walked the lot prior to confiscation. *Id.* at *1, 2005 Cal.App. Unpub. LEXIS 5011, at *3. It didn't notice any vehicles that were segregated or designated as consigned vehicles, all vehicles indicated that they were for sale and had buyer's information stickers in windows, and there was nothing in or on the vehicles after confiscation indicating that they were on consignment and didn't constitute vehicles or inventory as defined in the security agreement. *Id.* Although *Cornejo* is unpublished, its holding is consistent with the purpose of the UCC "to simplify, clarify and modernize the law governing commercial transactions." *Dean Machinery Co. v. Union Bank*, 106 S.W.3d 510, 517 (Mo.App. W.D.2003) (internal quotation omitted).